581 P.2d 884 (1978)
In the Matter of SHEROL A.S., Tammy W.S., and Chesley O.S., children under eighteen years of age.
COLEMAN S. and Lucille S., Appellants,
v.
DEPARTMENT OF INSTITUTIONS, SOCIAL AND REHABILITATIVE SERVICES and the State of Oklahoma, Appellees.
No. 49558.
Supreme Court of Oklahoma.
July 18, 1978.
John C. Hudson, Chickasha, for appellants.
Melvin R. Singleterry, Dist. Atty., District No. 6, Chickasha, by Larry E. Baresel, Asst. Dist. Atty., Clyde E. Davis, II, Legal Intern, for appellees.
*885 SIMMS, Justice.
Coleman and Lucille S. appeal from a judgment which terminated their parental rights in, and to, their daughter, Tammy, age 5, and their son, Chesley, age 2, and removed custody of their 15 year old daughter, Sherol, from them. We have granted Certiorari to the Court of Appeals, Division No. I from its opinion affirming the trial court.
Appellants present numerous assignments of error. They contend that the evidence was insufficient to support the court's order and that the trial court misconstrued and misapplied certain statutory provisions. Additionally, they enter procedural and substantive constitutional challenges to our termination statutes generally, and as applied in this action.
Appellants argue that the basis, if any, of the trial court's judgment was their poverty per se. They submit that the totality of the evidence "against" them  in its strongest light  showed only that:
(1) They are poor and uneducated people; and
(2) that their house was sometimes dirty; and
(3) that their social worker thought they were "lazy and lacked initiative"; and
(4) that their older daughter, Sherol, missed a lot of school.
Appellants admit that they are poor people with little formal education. Neither went beyond the seventh grade. Coleman has been totally disabled since 1964 when he was buried in a pipeline excavation and suffered permanent nerve and muscle damage from oxygen deprivation. Because of his physical condition he has been unable to hold a job for any substantial period of time and at the time of the termination hearing, he was receiving social security disability benefits. They admit that their house was, for a variety of reasons, dirty at times and that Sherol's school attendance was poor. They argue that these facts do not, however, either separately or collectively, constitute grounds for termination of parental rights under 10 O.S. 1971, § 1130. They submit that neither their poverty, dirty house, lifestyle that is not illegal or immoral, or Sherol's poor school attendance justified the court's order and that the judge acted arbitrarily and outside the scope of his authority in entering this judgment.
Appellants argue there was no showing, and indeed no attempt to show, that they were "unfit" parents who neglected, abused or abandoned their children, or that their financial status, "lifestyle" or housekeeping *886 standards had a substantial detrimental effect on the children  such as disease, malnutrition or exposure. They contend that rather than showing that their children suffered harm from neglect or mistreatment, the evidence instead showed that they loved their children very much and that the children were well cared for and happy. They were, they assert, shown to be a close-knit, happy family with no problems other than those common to families of modest means.
We agree with appellants' summary of the evidence and we agree that the evidence was patently insufficient to support the judgment of the trial court. Inasmuch as the insufficiency of the evidence is dispositive of this appeal, we restrict our discussion and our holding to that issue.
It is impossible to discern from the record the exact event which precipitated this action, but it is clear that from beginning to end, its substance has revolved around appellant's housekeeping habits. Specifically, as to whether or not they were maintaining, in the words of the trial court, "minimum standards of cleanliness."
On March 11, 1974, a verified petition was filed alleging that Sherol, Tammy and Chesley[1] were dependent and neglected children within the purview of the juvenile code. The sole basis alleged in support of the petition was that:
"[s]aid children have not had the proper parental care or guardianship and whose home, by reason of neglect and depravity on the part of their parents is an unfit place for said children."
On that date, the court, pursuant to the petition and upon his belief that an emergency existed, issued an order placing immediate temporary custody of the children with the Department of Institutions, Social and Rehabilitative Services (Department), appellee herein.
Two days later an amended petition was filed, the exact allegations were reasserted but the relief sought was changed to pray for termination of appellants' parental rights.
Adjudicatory hearing was set for March 27, 1974. At that time appellants' court appointed attorney moved the court to continue the matter of the adjudication for three months. The reason for the requested continuance clearly appears from the reported dialogue between counsel and the court: it would afford appellants an opportunity to remedy those conditions in their home which the Department found objectionable. In that way the deficiencies which resulted in the action could be corrected before hearing on the petition was held.
In retrospect, statements of appellants' counsel show a gross misunderstanding between appellants and the Department as to the seriousness of the consequences that would follow the adjudication of the children as dependent and neglected:
"At the present time the children are outside the home and the [appellants] have been assured repeatedly this is a temporary thing to give them an opportunity to straighten this household around to meet standards that are apparently being set by the Welfare Department."
Pursuant to the request, hearing was continued until June, 1976, at which time another attorney appointed to represent appellants appeared and stipulated to the allegations of the petition. Inasmuch as the petition contained only the broad conclusory language of the statute[2] without any factual allegations in support thereof[3] and testimony by Mrs. S., theoretically offered in support of the stipulation, showed instead that the conditions which led to the initiation of the action had been corrected[4]  the *887 legal basis for this stipulation is unclear. (We recognize that the attorney prosecuting the appeal was not the attorney who entered the stipulation.)
The motivation behind the stipulation, however, is obvious: in exchange for stipulating to the adjudication, the appellants were to be restored the custody of their children.
The court accepted the stipulation, adjudicated the children dependent and neglected and returned their custody to appellants under supervision of the Department. The matter of termination of parental rights was set off until December 6, 1974, and the judge advised appellants the issue would be heard earlier if they failed to maintain an "acceptable standard of living", mentioning specifically bathroom facilities and clean clothes, and further advised appellants that the Department would be checking on them unannounced periodically to see if they were maintaining this standard.
Hearing on the issue of termination was again set off. On December 12, 1974, a hearing to review custody was held, however, and the court ordered custody to remain with appellants. The children were at all times in appellants' custody until the termination hearing was eventually held on March 5, 1976.
At that hearing, the State called three witnesses: Bob Holman and R.Z. Howell, attendance officer and visiting counsellor, respectively, of the Chickasha Schools; and Don Ulrich, Grady County Juvenile Officer. A summary of their testimony showed the following. Sherol had missed 64% of the current school year at Chickasha but the records did not reflect the reasons for her absences, and she had recently transferred to the Amber-Pocasset District. Mr. Howell and Mr. Ulrich had each made one visit to appellants' home. Mr. Howell, at the request of Mrs. S., went to the home on January 23, 1976, to counsel with Sherol about school; because he knew she had been ill and hospitalized, he took the school nurse with him; Tammy and Chesley were not in the home, but Sherol was, and appeared to be ill; the appellants expressed their desire for her to regularly attend school and Mrs. S. said she thought Sherol had "some block" about school. Mr. Howell declined to comment on appellants' home situation as he had been in the home just once and then to visit Sherol; asked about the condition of the home that day, he stated that "the sheets and things on the bed were dirty and the home was generally dirty." He agreed with Mrs. S. that Sherol had a "block" about school but he didn't know the basis of it.
Mr. Ulrich testified that at the request of the Department he went to appellants' home on July 7, 1975, to take photographs; that he took three photographs of the interior of their home (State's Exhibit 2) and, as they reflected, there were several boxes of clothes on the floor and the kitchen was dirty; that Tammy and Chesley were in the home but he didn't recall observing the condition of the youngsters; the house, on the day of his visit, "looked like some improvement could be made"; when asked by the district attorney if it was a "proper place and suitable for rearing children", he responded, "not in the condition it was in" on July 7, 1975.
Over appellants' objections, and in spite of the fact that she was present in the court room, the State was allowed to put in evidence a written "Social Summary" prepared *888 by Valree Allen, appellants' social worker.[5] The essence of Mrs. Allen's "summary" was as follows: each time she had "visited" in appellants' home it was "dirty"; the appellants appeared to her to be "very lazy and lacking in initiative"; Sherol's school attendance was worse; appellants love their children and appear to be "contented with this way of life" but to Mrs. Allen, they "appear very weak in their parental role" in that they "allowed" Carol and Delbert to quit school and now Sherol's grades were such that she could not, in Mrs. Allen's opinion, pass. Tammy, Mrs. Allen pointed out, was in the first grade, was happy with school and did not miss it. The appellants, in Mrs. Allen's opinion, were "not strong enough people" to "cope" with Sherol's feelings or discipline her, and "without careful planning" Tammy and Chesley would "fall into the same pattern" as Carol, Delbert and Sherol.
That was the entirety of the State's case against appellants. Appellants demurred to the evidence, arguing that the State had not sustained its burden of proof; pointing out that the only testimony elicited as to the children was about Sherol, and that went only to her school attendance and that absolutely no testimony had been given as to whether these three children were neglected by reason of lack of parental care.
Appellants' demurrer to the evidence should have been sustained.
It is true that in recent months this Court has been divided on many aspects of our involuntary termination procedure.[6] There is, however, one important point upon which we all agree: The purpose of termination is to protect children from HARM suffered by reason of either neglect or the intentional actions of their parents. Termination is not a means by which the State of Oklahoma, through its juvenile courts and the Department, can exact conformity from its citizen-parents through the imposition of an "acceptable" common value system and "lifestyle". There is no authority in our Juvenile Code which allows the State to interfere with family relationships where harm to children is not involved.[7] This is, of course, a notion of constitutional dimension. The fundamental integrity of the family unit, which has found protection in the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Ninth Amendment, is subject to intrusion and dismemberment by the State only where a "compelling" State interest arises and protecting the child from harm is the requisite State interest.[8]
Here the evidence showed absolutely no actual or imminent harm to Tammy and Chesley. In fact, the only testimony about them at all was that they weren't home when Mr. Howell came to see Sherol and that although they were home when Mr. Ulrich came to the home, he couldn't remember anything about them. The hearsay written report of Mrs. Allen's said nothing about Chesley and revealed only that Tammy liked school and was rarely absent.
*889 After their demurrer was overruled, appellants presented the following evidence in their behalf. Their testimony showed that Sherol had suffered tonsil related problems for quite some time and her tonsils had been removed in December, 1975; that except for the fourth grade, Sherol had been promoted each successive year; and that her grades had improved greatly since transferring to Amber-Pocasset. In regard to the clothes on the floor the day Mr. Ulrich came, Mrs. S. explained she was gathering the wash, and she explained why the house was dirty during some of Mrs. Allen's visits. Mr. S. stated that he had painted the house, laid new linoleum and gotten new bedding, and he thought their home was about average for a family  not perfect and not real bad. Their monthly income was approximately $470.00, Mrs. S. calculated, consisting of Welfare and Social Security benefits. Mrs. S. stated that she was willing for the Judge and District Attorney to go right then and inspect their home.
Appellants called three neighbors, one of whom was their landlady, as witnesses. Essentially their testimony was that they had been frequent visitors in appellants' home and they thought it was a normal household for people raising children: sometimes it was clean and sometimes it was not. In their opinion Tammy and Chesley were polite and well-behaved children; Tammy, Sherol and Delbert were always clean, but Chesley  as little boys are wont to do  would get dirty immediately after being cleaned up. Their landlady testified that appellants were good tenants; they didn't drink or cause disturbances and had done considerable work in improving the property; she had never seen debris on the property and would have required appellants to leave if they had caused or allowed the property to deteriorate. In her opinion, appellants' housekeeping standards were those of "average poor people."
Sherol S. testified that most of her absences were due to illness and that although her parents made every possible effort to see that she attended school, she sometimes skipped school without their knowledge or permission; that she liked her new school better than Chickasha and her grades were improving. Sherol stated that although she had been unhappy at school, she was not unhappy at home.
Appellants also called Valree Allen, their Social Worker, whose written report had been admitted in the State's case-in-chief. She testified that she had been employed by the Department since October, 1975, at which time she "inherited" appellants, but that she did not actually go to the appellants' home until December, 1975, because from October until December she was "reading manuals" and "trying to learn" how to be a social worker. Mrs. Allen had a BA in business and had previously worked with the Head Start program testing children and conducting parent interviews. Mrs. Allen stated that she tried to go to appellants' home every other week and had made approximately six visits there; that she had seen Chesley be "very, very dirty, many times" but that Tammy was usually in school. Mrs. Allen testified that Mrs. S. had asked her to counsel with Sherol about missing school and that she had done so; that Sherol told her she hated school and didn't like anything about it, she hated the teachers, thought they didn't like her, and wanted to transfer to Amber-Pocasset. Mrs. Allen agreed that appellants make an effort to get Sherol to school and keep her there; she knew that some of Sherol's absences were due to illness; she also agreed it is not abnormal for a child to hate school and teachers. Mrs. Allen stated that the reason she thought appellants were "lazy and lacking in initiative" was because on her visits it appeared to her that they were "just sitting there watching TV in all this filth and mess."
In her opinion, amount of income has no bearing on the condition of a home; "some" of the welfare recipients she worked with had cleaner houses than appellants' and managed to keep their children in school. Asked whether she considered this a "happy or unhappy home as far as the children and family unit" were concerned, Mrs. Allen replied, "I think they are happy living like that."
*890 Based upon her five months "experience, learning and skill" in the field of social work, it was Mrs. Allen's opinion that it "seems like there is a pattern" and that if Tammy and Chesley were left in appellants' home, it was "possible" they would fall into the same pattern as Carol, Delbert and Sherol. She explained that pattern as "not going to school, not wanting to go to school and the parents allowing them to quit school." Mrs. Allen testified, however, that she had never met Carol and didn't know why Delbert quit school.
Announcing his judgment, the court noted that this case was primarily about "a minimal standard of cleanliness," which he found appellants had not met and, although noting that "within their limited ability the [appellants] do try and ... do love their children", ordered their parental rights in and to Tammy and Chesley terminated. Due to Sherol's advanced age and resulting ineligibility for adoption, the court only removed her custody from appellants.
In fairness we cannot hold out appellants as a typical Oklahoma family and it appears from the record that these children will enjoy fewer material, educational and cultural advantages than many of their peers  but these facts do not rise to the threshold of harm prerequisite to severing the natural and legal bonds of parent and child.
The social sciences may or may not recognize psychological "patterning" among siblings as a natural phenomenon, but it is not the stuff from which the law on termination is made. It should be mentioned that the State does not take young children from parents when their older child is convicted of a heinous crime. Sherol's school problems were not even shown by the record to be related to Delbert and Carol's reasons for leaving school. Any school problems these three older children had, whether common or separate, was the proper concern of the appellants and the school system  not the juvenile court in a termination proceeding involving Tammy and Chesley.
We stress that we are not concerned here with a case where disease and pestilence affected these children without parental concern or correction. The only proof is of a "dirty" house. Dirt alone has not been shown by history, or by the record in this case, to be so harmful to children that governmental interference in family relations is warranted.
In 1924 the Supreme Court of North Dakota had occasion to rule upon a very similar situation in In re Kebler, 51 N.D. 698, 200 N.W. 786. There the court reversed a judgment removing children from their parents' "indescribably dirty" home on the ground of neglect and offered the following observation on the sanctity of the family unit in our country. Perhaps these words are even more necessary to read and reread in 1978 than they were in 1924:
"The parents may not be blessed with intelligence of the highest order, nor with a high degree of education or culture. The law, however, makes no distinction between the genius and the common man, the educated and the ignorant, the refined and the uncouth, the rich and the poor, in so far as the natural right to the custody of offspring is concerned. Every consideration of justice and humanity requires that family ties shall not be lightly sundered. * * * The home and the family, held together by the ties of natural, rather than adoptive, affection, is the last bulwark of American institutions. Poverty, lack of education or of culture alone, are never sufficient justification for severing the ties that bind families together. In this western country, on these western plains, many a home might have been broken where large families were raised by the pioneers in one room cabins of logs or sod, had poverty, lack of education, or begrimed faces of children, playing on naked Mother Earth, been the only showing required. In a recent case, very similar in its facts to the one here, and under analogous statutes, the Superior Court of Pennsylvania said:
`The great bulk of the evidence seems to show there was really nothing *891 wrong with the children who are the subject of this complaint, except that they were dirty and not well groomed. * * * It was not the purpose of the statutes now in force in Pennsylvania to prescribe just how often in a week a child should be scrubbed. Within the writer's knowledge, a generation of vigorous men and women have grown up under conditions that would not meet the approval of some of the witnesses of the commonwealth.' Commonwealth v. Bickel et al., 78 Pa.Super. 348 p. 351.
"It by no means follows that a child's welfare is always necessarily promoted by removing him from a home of poverty and hard work, and transplanting him in another home of luxury and ease."
See also, In re Sweet, Okl., 317 P.2d 231 (1957).
The decision of the Court of Appeals, Division No. 1, is Vacated; the Judgment of the trial court is Reversed and the cause Remanded to the trial court with Directions to Dismiss the Petition and restore immediate custody of these three children to appellants.
All the Justices concur.
NOTES
[1] An older son, Delbert, was originally included in this action but he reached majority during the pendency of the trial court proceedings.
[2] 10 O.S. 1971, § 1101(c).
[3] See: 10 O.S. 1971, § 1103(b)(1).
[4] "Q. Mrs. S., do you have your rent paid?

A. We have it paid for two weeks. Everything is in working order.
Q. Have you had the bathroom in the home fixed?
A. Yes.
Q. Does it now have adequate sanitary standards?
A. Yes the shower is in.
Q. What about toilet facilities?
A. Yeah, it is fixed.
Q. What about the presence of Carol [older daughter] and her husband?
A. They have moved. They are living at 527 South Sixth and he has got a job. He has got him a permanent job and they are making it just fine.
Q. Is your husband currently employed?
A. No, he got laid off out here at the Circle "B" horsetrailers because of our car. We had two cars and they both tore up on us.
Q. He is presently seeking employment?
A. He has his application in at Maremont and he has also got his application out at Carl-Bilt."
[5] As this matter is resolved on other grounds, we do not address the impropriety of allowing this hearsay testimony in a hearing to terminate parental rights.
[6] See: J.V. v. State of Oklahoma, DISRS, Okl., 572 P.2d 1283 (1977); Matter of Keyes, Okl., 574 P.2d 1026 (1978); Matter of Ernest James C., Okl., 578 P.2d 352 (1978); Matter of Christopher H., Okl., 577 P.2d 1292 (1978); Ilee M. v. DISRS, Okl., 577 P.2d 908 (1978).
[7] 10 O.S. 1971, § 1130(c)(3) requires that:

"... permanent termination of parental custody of the child, or children, IS NECESSARY TO PROTECT ITS PHYSICAL OR MENTAL HEALTH OR MORALS ..." (emphasis added)
[8] Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1943); May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Cleveland Board of Education v. La Fleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); Alsager v. District Court of Polk County, 406 F. Supp. 10 (S.D.Iowa 1975); Roe v. Conn, 417 F. Supp. 769 (M.D.Ala. 1976); Sims v. State Dept. of Public Welfare, etc., 438 F. Supp. 1179 (S.D.Tex. 1977).