In the Matter of H.J., H.J., A.H., H.P. and B.J., Alleged Deprived Children.

Terri HECKATHORN, Appellant,

v.

STATE of Oklahoma ex rel. DEPARTMENT OF HUMAN SERVICES, Appellee.

No. 79276.

Court of Appeals of Oklahoma, Division No. 2.

April 13, 1993.

Rehearing Denied May 10, 1993.

Dan R. Brown, Lawton, for appellant.

Jerry C. Cude, Asst. Dist. Atty., Lawton, for appellee.

BRIGHTMIRE, Judge.

Did the trial court err in entering judgment on a jury's verdicts recommending termination of the appealing mother's parental rights?

We hold it did not.

I

The orientational facts are these. The five minor children of appellant Terri Heckathorn—8–year–old H.P.; 6–year–old B.J.; 5–year–old H.J.; 3–year–old H.J.; and 1–year–old A.H.—were taken into protective custody by the State of Oklahoma Department of Human Services in May 1988. The action was taken after school officials discovered H.P. and B.J. had head lice and

were unable to locate their mother.[1] The school officials took the children home where they found the other three children and, upon examining them, discovered that they too had head lice. They also found that the children had been left with the mother's boyfriend who said he had not seen the mother since the night before and did not know where she was. The school personnel reported the matter to DHS. Upon being told by H.P. that she had been sexually abused by the mother's boyfriend, DHS obtained orders on May 19 placing all five children in a shelter facility.

Shortly thereafter, on May 23, 1988, DHS filed five petitions seeking to have the children declared deprived and the mother was advised that the state "may move to terminate parental rights." Supporting allegations were that H.P. had been sexually abused "several times, by men known to her mother;" that all the children are "dependent on others for [their] care as [the] mother is frequently absent from the home;" that the children are "not properly fed, clothed or bathed;" and that the parental home "has been observed to be filthy with feces, garbage, dirty clothes and food in various stages of decay strewn throughout."

The mother stipulated to the allegations on July 27, 1988. Consequently the children were placed in foster care[2] and the mother was ordered to seek employment or employment training, obtain suitable housing, have supervised visitation and attend parenting classes.

A petition to terminate the mother's parental rights was filed by the State December 28, 1989, on behalf of each child. The mother resisted the actions and the matter was tried to a jury April 17, 1990. It decided the mother's parental rights should not be terminated and judgments were rendered accordingly.[3] At the same time the court stated that "all previous orders are to remain in effect;" that the children are to remain in foster care; and a redispositional hearing would be held on May 17, 1990.

The mother, however, failed to appear on May 17. The court found her to be in default and reinstated the previously ordered standards of conduct and also ordered the mother to "obtain a psychological evaluation."[4]

Then on December 16, 1991, the State filed a second set of petitions to terminate the mother's parental rights in the five children alleging that the mother had failed to correct the conditions which led to the deprived adjudications and that termination would be in the best interest of the children.

Following this the mother moved to dismiss the petitions on the ground they unconstitutionally exposed her to double jeopardy. The motions were overruled February 5, 1992, and the matter proceeded to trial. On February 6 the jury returned its verdict recommending termination of the mother's parental rights in all five children. Judgments terminating such rights were entered February 21, 1992.[5]

The mother appeals.

## II

Her first contention is that the second series of petitions to terminate her parental rights filed in 1991 constitute double jeopardy and a collateral attack on the 1990

1. A review board report dated September 22, 1988, states that "[t]his was the ninth allegation on the Central Child Abuse Registry involving one or more of Terry Heckathorn's children [and] [t]his was the fifth time one or more of Terry Heckathorn's children had been placed in foster home care."

2. On November 10, 1988, custody of A.H. was placed with her legal father in Idaho where she remains. A.H.'s natural father, an Osage Indian, could not be located and the Osage Tribe declined to intervene in this matter.

3. The parental rights of the defaulting natural fathers of the children were terminated April 17, 1990, on the ground of abandonment. See 10 O.S.1991 § 1130(A)(2). A.H. remained in the custody of her legal father in Idaho.

4. The mother had successfully completed the court-ordered parenting class December 13, 1988.

5. The mother's motions for new trial were overruled on that same date.

judgments adjudicating that such rights should not be terminated.

The argument is that the "evidence presented in the second trial was essentially identical to the first trial [because] [t]he State presented some testimony from some of the same witnesses to support their claim in both cases." As a result, concludes the mother, both the federal and state constitutional guarantees against double jeopardy have been violated.[6]

■ We disagree. The double jeopardy clause[7] is designed to protect one against being subjected to the risk of losing his life or liberty by being tried more than one time for a single criminal offense or one that is at least criminal in nature.[8] The courts of this country have not been inclined to extend the strict common-law rule—which limits application of the double jeopardy concept to criminal prosecutions[9]—although some have applied the constitutional proscription in certain civil proceedings in which the judgment serves the goal of "punishment," *e.g.*, a sanction.[10]

■ Here, however, we are not dealing with a punitive proceeding, but one aimed at achieving the correction of parental behavior and protection of five neglected youngsters.[11] Indeed, the entire philosophical rubric permeating the Juvenile Act relates to promoting the welfare of children—not the infliction of punishment. Nothing in the Act speaks to punishing either the neglected children or their wayward parents.

And this is the situation here. The state has not in the past sought nor is it now seeking to punish the mother by petitioning for termination of her parental rights. Its sole goal is to protect the natural mother's five little children from the harm which they have been experiencing.[12]

We conclude therefore that the mother's first proposition of error is without merit.[13]

### III

■ Her next assignment of error is that the termination of her parental rights is not supported by the evidence.[14]

Again we disagree. In May 1990 the trial court imposed the following standards of conduct on the mother: (1) continue to visit with her children; (2) obtain employment; (3) obtain a safe and suitable home; and (4) obtain a psychological evaluation.

It is undisputed that the mother understood what the court order required of her. It is also undisputed that the mother's com-

---

6. The fifth amendment of the U.S. Constitution states in relevant part: "No person shall ... be subject for the same offence to be twice put in jeopardy of life or limb." Article 2, section 21 of the Oklahoma Constitution states: "No person shall ... be again put in jeopardy of life or liberty for that of which he has been acquitted [n]or shall any person be twice put in jeopardy of life or liberty for the same offense."

7. The state constitutional prohibition against double jeopardy is coextensive with that of the federal constitution. *Edwards v. State,* 815 P.2d 670, 672 (Okl.Cr.1991). And the federal fifth amendment prohibition applies to the states via the fourteenth amendment. *Garrison v. Jennings,* 529 P.2d 536, 539 (Okl.Cr.1974).

8. *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975).

9. *Pickens v. State,* 393 P.2d 889, 891 (Okl.Cr. 1964). *See also Price v. Reed,* 725 P.2d 1254, 1258 (Okl.1986).

10. *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989).

11. *See Killian v. Burnham,* 191 Okl. 248, 130 P.2d 538, 539 (1942).

12. *See, e.g., Matter of Sherol A.S.,* 581 P.2d 884, 888 (Okl.1978).

13. Nor are the doctrines of collateral estoppel or res judicata applicable. A trial court in juvenile matters retains continuing jurisdiction to protect the best interests of its wards. The 1991 petitions were based on the mother's failure to correct the conditions which led to the deprived adjudication. Evidence of the cumulative efforts of the mother since 1988 were relevant but significantly included new evidence occurring since the first trial.

14. The mother also complains that she was prejudiced by the trial court's failure to admonish the jury to disregard improper closing argument made by the State. This proposition of error was not preserved in the mother's petition in error and thus cannot be considered on appeal. *Barber v. Flynn,* 628 P.2d 1151, 1153 (Okl.1980).

pliance with two of the criteria—employ-ment and suitable housing—was not only sporadic but inadequate. The mother had not paid rent on any of the seven to twelve residences she has lived in since 1988. Accommodations for the children have either been inadequate or nonexistent. She has not worked since 1990, and before that her employment history was grossly irregular. And the evidence indicates that while she regularly visited her children, the overall effect of the visits on the children was questionable and often negative.

Though no formal, written psychological evaluation was presented to the court, the mother introduced the testimony of Dr. Hellwege, a psychologist who had seen her enough to reach this diagnosis: She had a "fairly extreme" case of "histrionic personality disorder." [15] Such a disorder, said the doctor, causes "very changeable" and "exaggerated" emotional reactions to certain stimuli and makes it difficult, for example, to maintain employment because "[i]t's kind of like they're buffeted around by their emotions." An afflicted patient, he said, should make some "noted changes or improvements" in "two to seven years" of continuous therapy. Here, however, the mother dropped out of therapy in October 1991 after having made very little progress in her treatment.[16] The expert predicted that there was a "high probability" she would "quit again." His opinion was that although he believes the mother loves her children "as far as that goes," her ability to care for them, in his opinion, "would prob—could, and I say that with reservation, could improve, yeah." And what did the expert think the effect of all this would be on the children? "It's not good," he said.

We hold that sufficient competent evidence was presented to support a finding by the jury that the mother had failed to correct the conditions that led to the deprived adjudications and that the best interests of the children would be served by terminating the mother's parental rights.

The judgment appealed is affirmed.

REIF, V.C.J., and RAPP, P.J., concur.

---

**15.** The mother started seeing the counselor in June 1991 and continued "once a week or every other week" until October 1991.

**16.** The mother returned to therapy one week before the February 1992 trial.