2007 OK CIV APP 77

**In the Matter of J.C., and J.C., deprived children who are less than 18 years of age.**

The State of Oklahoma,
Petitioner/Appellee,

v.

Kathy Shannon and Calvin Charles,
Respondents/Appellants.

No. 103,645.

Court of Civil Appeals of Oklahoma,
Division No. 2.

July 24, 2007.

Tim Harris, District Attorney, Tara Britt, Assistant District Attorney, Tulsa, OK, for Petitioner/Appellee.

David C. Morse, Jenks, OK, for Respondents/Appellants.

Sal Munoz, Assistant Public Defender, Tulsa, OK, for Children.

JOHN F. FISCHER, Presiding Judge.

¶ 1 Biological parents appeal from the Trial Court's termination of their parental rights with respect to their children JC and JC. Based on our review of the record on appeal and applicable law, we affirm.

## BACKGROUND FACTS

¶ 2 On March 1, 2005, the State of Oklahoma filed a petition requesting that the Trial Court adjudicate that JC and JC were deprived and terminate the Mother's parental rights to both children. In an amended petition filed September 9, 2005, the State sought termination of the Father's parental rights to both children as well. After a nonjury trial on July 6, 2005, the Father and the Mother demurred to the sufficiency of the State's evidence. The Trial Court found that the children were deprived and terminated the parental rights of both parents. The Mother and the Father filed this timely appeal.

## STANDARD OF REVIEW

¶ 3 When reviewing a trial court's termination of parental rights, we examine the record on appeal to ascertain whether its decision to terminate is supported by clear and convincing evidence. *In re S.B.C.*, 2002 OK 83, ¶¶ 5–7, 64 P.3d 1080, 1081–82.

## DISCUSSION

¶ 4 At issue in this termination proceeding is the constitutionally protected right of the Mother and the Father to parent these two children. As the parents correctly argue:

The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.... When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982).

¶ 5 The constitutional interests of the parents, however, are not absolute. Equally recognized in this State are the constitutional rights of children.

The interest of children in a wholesome environment has a constitutional dimension no less compelling than that the parents

have in the preservation of family integrity. In the hierarchy of constitutionally protected values both interests rank as fundamental and must hence be shielded with equal vigor and solicitude.

*In re T.H.L.*, 1981 OK 103, ¶ 13, 636 P.2d 330, 334.

¶ 6 The two children involved in this termination were the Mother's fifth and sixth children and, at least, two of the Father's children with the Mother.[1] The grounds for termination as to each parent are different and will be discussed separately.

### I. The Mother's Termination

¶ 7 The State sought to terminate the Mother's parental rights for essentially two reasons. First, the State alleged that it had previously terminated the Mother's parental rights to other children and that she had failed to correct the conditions that led to the previous terminations or the conditions that led to these children being adjudicated as deprived. Second, the State alleged that the Mother has been diagnosed with various mental disorders "which greatly inhibit the natural mother's ability to stabilize and care for her children when she is not taking medication for the disorders." In its petition, the State cited 10 O.S.2001 §§ 7006–1.1(A)(6)[2] and 7006–1.1(A)(13).[3]

### A. The State's Evidence

¶ 8 At trial, the State submitted four previous orders terminating the Mother's parental rights to four of her seven children. The first order, *In re C.S.*, JVD–95–90, provided:

been adjudicated deprived; (2) the child has been placed in custody outside the home of a natural or adoptive parent, guardian or extended family member; (3) the parent has a mental illness or mental deficiency that renders the parent incapable of adequately and appropriately exercising parental rights, duties and responsibilities; (4) the continuation of parental rights would result in harm or threatened harm to the child; (5) based on competent medical opinion, parent's mental illness or deficiency will not respond to treatment, therapy or medication and will not substantially improve; and (6) termination of parental rights is in the best interests of the child.

---

1. Mother's parental rights to her four older children had been previously terminated. At the time of trial, she was pregnant with her seventh child.

2. 10 O.S.2001 § 7006–1.1(A)(6) provides that a court may terminate the rights of a parent to a child based on a finding that a subsequent child has been born to a parent whose parental rights to any other child have been terminated by the court; provided, that the applicant shall show that the condition that led to the making of the finding that resulted in the termination of such parent's parental rights to the other child has not been corrected.

3. 10 O.S.2001 § 7006–1.1(A)(13) provides that a court may terminate the rights of a parent to a child based on a finding that: (1) the child has

[T]he court finds that the State's motion should be sustained based on clear and convincing evidence that was uncontroverted that the mother:

   a. failed to comply with the dispositional standards;

   b. failed to follow through with individual counseling;

   c. failed to complete parenting classes;

   d. failed to maintain sufficient income to sustain the needs of the child.

The dispositional standards in that case ordered, "That the mother seek appropriate employment or income sufficient for the child's needs; attend and complete parenting skills classes; provide a safe, stable independent home for the child; visit with the child at least once per month; and attend individual counseling." The order recited that the Mother's medical records "indicated that the mother lacks insight, is impulsive, lacks decision making capabilities, is unable to procure independent transportation, and has sparse or no coping skills."

¶9 In *In re A.N.S.*, JVD–99–108, the Court ordered the Mother's parental rights terminated pursuant to 10 O.S.2001 § 7006–1.1(A)(15) because the State had placed the child in foster care for fifteen of the most recent twenty-two months.

¶10 In *In re J.S.*, JD–2001–218, the Court terminated the Mother's parental rights pursuant to 10 O.S.2001 §§ 7006–1.1(A)(5), (6), (7), (13) and (15) after a jury found that: (1) the State had placed JS in foster care for fifteen of the most recent twenty-two months; (2) the Mother had wilfully failed, refused or neglected to contribute child support; (3) the Mother failed to correct the conditions that led to JS being adjudicated as deprived; (4) the Mother failed to correct the conditions that led to the termination of her parental rights in the past; and (5) the Mother had a mental illness or deficiency that rendered her incapable of providing adequate care and which did not respond to therapy or treatment.

¶11 In *In re K.C.*, JD–2002–169, the Court once again ordered the termination of the Mother's parental rights in accordance with 10 O.S.2001 §§ 7006–1.1(A)(5),(6),(7) and (13)

after a jury determined that: (1) the Mother had wilfully failed, refused or neglected to contribute child support; (2) the Mother failed to correct the conditions that led to JS being adjudicated as deprived; (3) the Mother failed to correct the conditions that led to termination of her parental rights in the past; and (4) the Mother had a mental illness or deficiency that rendered her incapable of providing adequate care and which did not respond to therapy or treatment.

¶12 The State also offered the testimony of Dr. Michael Martin. Based on his review of the Mother's mental health history and the psychological evaluation he personally conducted, Dr. Martin testified that the Mother suffered from Borderline Personality Disorder. Dr. Martin testified that, due to the Mother's condition, in times of stress she was prone to angry outbursts, unreasonable paranoia, auditory and visual hallucinations, difficulty tolerating confrontation and unrealistic expectations from her relationships with both adults and children.

¶13 Dr. Martin also testified that he believed the Mother had a Reactive Attachment Disorder, which developed in her childhood as a result of her relationship with her biological parents and her foster parents who were cruel and abusive. And, while her symptoms at particular points in her past may have manifested and been diagnosed in various ways, the Borderline diagnosis had been consistent throughout her past. Ultimately, the Reactive Attachment Disorder made it difficult for the Mother to develop realistic, bonded relationships with others, including her children.

¶14 When asked whether the Mother's condition could be corrected with treatment, Dr. Martin responded, "Twenty years ago there was treatment that would be quite effective," and "Borderline individuals can make significant changes, if they're able to maintain their relationship with a therapist over time." Dr. Martin further testified that such treatment is not currently available because "this is an extremely expensive and intensive treatment," and that the in-patient facilities that provided this treatment in the past had closed. In his psychological evaluation Dr. Martin states, "[The Mother's] per-

sonal and emotional difficulties run very deep in her personality and her prognosis at this particular time would be poor." When asked to elaborate, Dr. Martin stated, "[The Mother's prognosis] would be poor for her resolving [her difficulties] over time to where you could see her having long-term relationships that were satisfying and productive," and that "medication has little effect on [her] personality disorder."

¶ 15 Dr. Martin's testimony establishes that, at best, any improvement in the Mother's condition would be "[e]xtremely gradual, it would have to happen over years." Dr. Martin testified that before the Mother would be able to spend any time with her children, she must first form a bond with a therapist, resolve her issues with interpersonal relations, and work through her history of physical and emotional abuse. After working through these issues, Dr. Martin testified, the Mother could begin supervised visitation, progress gradually to limited visitation and, eventually, begin overnight visitation with her children. Dr. Martin further testified that, at the earliest, reunification should not begin until after the Mother had undergone successful treatment for a year to eighteen months.

¶ 16 The Mother testified in the State's case-in-chief that she had been employed in her current job as a waitress for the past two months and that, due to a recent pregnancy, she was only able to work once a week. She further testified that she had resided at her current residence for less than a month. The Mother testified that her monthly income, which consisted of her wages, contributions from social security insurance and medical disability, totaled $651. She further testified that her current monthly expenses totaled $371. She testified that she had not contributed to her children's support because she was never ordered to do so by a court. The Mother further testified that she visited with the children regularly and generally twice a month unless they were out of town.

¶ 17 Subsequent to her initial termination order, the Mother sought therapy to help correct her mental illness. According to her testimony, the Mother had participated in individual counseling, pet therapy and group therapy following the initial termination. Prior to termination of her parental rights in 2002, the Mother pursued therapy with therapist Alisa Longnecker for four years and had worked with Dr. Sharolyn Wallace and therapist Manju Kaul. The Mother testified that she had not seen a therapist for a period longer than six weeks since her termination in 2002. Finally, the Mother testified that Dr. Martin was the first to tell her that she had a Reactive Attachment Disorder and that it was helpful to know that information in order to understand why she acted they way she did at times.

¶ 18 JC and JC were taken into state custody within two weeks of being born. From that time, the children resided in foster care with the adoptive parents of their older sister. Dr. Martin testified, "If [the Mother's] children stayed in foster care and they've never been with her, they're going to be the children of those foster parents." Dr. Martin also stated that the Mother's treatment, which requires that the children spend anywhere from fifty to one hundred percent of their time outside of her care during treatment, would be detrimental to their health, particularly where they are currently in a safe and stable environment with another sibling and foster parents who wish to adopt them. Dr. Martin concluded that it would not be in the best interest of the children to allow the Mother to attempt to complete therapy before terminating her parental rights.

## B. The Mother's Position

¶ 19 The Mother does not challenge the prior terminations or the Trial Court's adjudication in this case that JC and JC are deprived. The Mother argues that "to use [her] previous termination of 1995 as the underlying basis for termination of parental rights in 2006, seems to be violative of fundamental fairness" and the constitutional guarantee of due process of law, analogous to a retroactive criminal penalty. First, the Mother ignores the 2001 and 2002 terminations.[4] Unlike the 1995 termination based

4. Although the State introduced the 1999 termi- nation, it is not relevant to a termination based

on Mother's failure to provide a safe and stable home, the last two terminations were based, at least in part, on subsection (A)(13) and clear and convincing evidence that the Mother had a mental illness or condition that will not respond to treatment. Second, contrary to the Mother's construction, subsection (A)(6) is not satisfied by proof that parental rights were terminated in the past. Proof of a previous termination is not dispositive even though it provides "relevant background information on the Parents' past propensities, care, handling of and attitude toward their children." *In re K.L.H.*, 1993 OK CIV APP 127, ¶ 16, 858 P.2d 1296, 1298. It does, however, satisfy one of the three elements required for termination pursuant to subsection (A)(6).

¶ 20 Contrary to the Mother's construction, subsection (A)(6) also requires a showing that the Mother has failed to correct those conditions that led to her previous terminations, and that the present termination is in the best interest of JC and JC. Consequently, subsection (A)(6) does not impose a retroactive penalty or violate the principle of fundamental fairness required by the Due Process Clause.

¶ 21 The Mother also argues that an individualized service plan (ISP) contained in a dispositional order issued pursuant to 10 O.S. 2001 § 7003–5.5 is a contract. The Mother contends, therefore, that her performance of the "contract" should be excused on the grounds of impracticability because she had limited financial resources, the cost of an effective therapy regimen for her mental disorder was very high, and the State failed to accurately diagnose her condition at the outset and provide effective therapy. These conditions, she contends, made it effectively impossible for her to correct the conditions in the ISPs.

¶ 22 The Mother's factual assertions in support of this argument are not entirely supported by the record. The Mother did not offer any evidence showing that she had requested, but was denied, any financial support from the State to pursue therapy. Rather, her own testimony establishes that

the State paid for her psychological examination by Dr. Martin as well as her past therapy sessions with therapists Longnecker, Wallace and Kaul. It appears, therefore, that the State is committed to assisting the Mother.

¶ 23 The Mother's commitment is not demonstrated by the record. Her attendance at therapy sessions was irregular, she appears to have at one point chosen "pet therapy" rather than the recommended form of therapy, and she refused some forms of required therapy. The Mother's "impracticability" argument, even if factually supported, is not relevant to the termination of her parental rights to JC and JC pursuant to subsection (A)(6).

¶ 24 Section 7006–1.1(A)(6) does not require that the State prove a parent has failed to satisfy the terms of an ISP with respect to the children being terminated. Unlike subsection A(5), subsection A(6) does not refer to section 7003–5.5 and does not require proof of failure to correct conditions contained in a section 7003–5.5 order. Subsection A(6) requires proof that the conditions justifying the previous termination have not been corrected. That proof, however, is not dependent on a "contract" or an agreement between the parent and the State concerning what must be corrected or the time within which any correction must occur. Consequently, if parental rights have been terminated pursuant to section 7006–1.1(A)(13) because of a mental condition that will not respond to treatment, proof that the mental condition has not changed would satisfy section 7006–1.1(A)(6) even in the absence of a section 7003–5.5 dispositional order.

¶ 25 In this case, the State introduced evidence that the Mother had still been unable to provide the safe, stable home, which resulted in termination of her parental rights in 1995. In addition, the State introduced evidence that the Mother's mental condition, the basis on which her parental rights were terminated in 2001 and 2002, had not improved.

¶ 26 This Court has previously addressed the termination of parental rights in two

on subsection A(6) because placement in a foster home for 15 of 22 months is not a condition a

parent can correct after the parent's rights to that child have been terminated.

circumstances that are instructive in this case. Both, however involved terminations pursuant to subsection A(5). *In re C.R.T.,* 2003 OK CIV APP 29, 66 P.3d 1004, held that a termination for failure to correct conditions for which the child was adjudicated deprived cannot be predicated on a mental illness that will not respond to treatment if the failure to correct is a manifestation of the mental illness. That case involved the initial termination of a mother's parental rights based on her mental condition and required application of subsection (A)(13) because, the Court concluded, the mother's condition would not respond to treatment and, therefore, she was not able to correct the conditions that led to the deprived adjudication. *In re R.S.,* 2002 OK CIV APP 90, 56 P.3d 381, affirmed termination because the mother had the ability, but failed to correct, the mental condition, the basis on which her children were adjudicated deprived.

¶ 27 In this case, we deal with the termination of the Mother's parental rights after two previous terminations, *In re J.S.,* JD–2001–218, and *In re K.C.,* JD–2002–218, in which a jury found that the State had proved by clear and convincing evidence that the Mother had a mental illness or deficiency that would not respond to treatment. There is nothing in the language of subsection A(6) that excludes use of a prior termination based on a mental condition that "will not respond to treatment." Likewise, there is nothing in the language of subsection A(13) that requires all terminations in which the parent has a mental condition unresponsive to treatment be prosecuted pursuant to that provision alone. Therefore, the Mother's previous terminations pursuant to subsection A(13) were relevant and admissible in this termination in which the State sought to rely on subsection A(6).

¶ 28 As previously discussed, however, when proceeding pursuant to subsection A(6) based on a previous termination pursuant to subsection A(13), the State must still prove two additional factors. First, that the mental illness justifying the prior termination persists. 10 O.S.2001 § 7006–1.1(A)(6). And second, that the termination is in the best

interests of the child. 10 O.S.2001 §§ 7006–1.1(A).

¶ 29 The first of these factors requires the State to prove that the parent's present and persistent mental condition "renders the parent incapable of adequately and appropriately exercising parental rights, duties and responsibilities." 10 O.S.2001 § 7006–1.1(A)(13)(c). For obvious reasons, an opportunity to correct the mental condition pursuant to a section 7003–5.5 order is not required for termination pursuant to subsection A(13). Nonetheless, and even though a parent with an untreatable mental condition is unlikely to be able to correct that condition, the State is still required to prove when proceeding pursuant to subsection A(6) that the previously determined condition continues to affect the parent's ability to properly take care of the children at issue. This requirement protects the constitutional rights of the parent regarding the parental relationship. It also avoids the "once wrong, always wrong" construction that the Mother finds in the statute. At the same time, it protects the child's equally important constitutional right to a "wholesome environment." *T.H.L.,* 1981 OK 103 at ¶ 3, 636 P.2d at 334.

¶ 30 This record contains clear and convincing evidence that the State met this burden. The evidence at trial showed that the Mother's parental rights had been previously terminated and that the Mother had failed to correct the conditions that resulted in those prior terminations. Therefore, we conclude that the Trial Court did not err in terminating the Mother's parental rights pursuant to section 7006–1.1(A)(6). This result makes it unnecessary for us to address the Mother's challenge to termination pursuant to 10 O.S. 2001 § 7006–1.1(A)(13).

## II. Father's Termination

¶ 31 The Father contends that the Trial Court erred in terminating his parental rights because he is confident that he could complete a treatment plan if the Trial Court were to assign one to him. Fatal to the Father's request for relief is his failure to allege any cognizable error by the Trial Court. The Trial Court terminated the Father's parental rights pursuant to 10 O.S.

2001 § 7006–1.1(A)(12).[5] At trial, the State offered evidence that on June 26, 1995, the Father pled guilty to attempted larceny of an automobile and feloniously pointing a weapon for which he received sentences of three years and eight years, respectively. The State offered further proof that the Father pled guilty to unauthorized use of a motor vehicle for which he received a ten year sentence. The State also submitted evidence that on May 11, 2005, following the birth of JC and JC on February 11, 2005, the Father plead guilty to concealing stolen property for which he received a four-year sentence; a sentence that the Father was still serving at the time of these proceedings.

¶ 32 The Father testified that he had been incarcerated on the most recent conviction since April 15, 2005, and that, consequently, he had not visited with, or sent any financial support to, the children. According to the Father's testimony, prior to his current incarceration he had only visited the children during the two weeks prior to their discharge from the hospital and that he had last seen them on April 13, 2005. The Father requests that this Court reverse the termination of his parental rights based on his willingness to establish a stable relationship with his children following completion of his sentence. The record establishes clear and convincing evidence that the Father had not spent a sufficient amount of time to develop a strong relationship with the children prior to his incarceration and that termination of the Father's parental rights was justified pursuant to section 7006–1.1(A)(12). Consequently, the Trial Court did not err in terminating the Father's parental rights to both children.

### CONCLUSION

¶ 33 The record on appeal establishes by clear and convincing evidence that: (1) the

Mother's parental rights to other children have been previously terminated and that she has failed to correct the conditions that precipitated those terminations and (2) the Father's incarceration justifies termination of his parental rights. Further, the Father has failed to allege or demonstrate any legal error on the part of the Trial Court. Accordingly, the Judgment of the Trial Court is affirmed.

¶ 34 AFFIRMED.

WISEMAN, J., concurs, and RAPP, C.J., dissents.

RAPP, C.J., dissenting:

¶ 1 I dissent.

¶ 2 Before the State may terminate Mother's parental rights pursuant to Section 7006–1.1(A)(13), the State must show by clear and convincing evidence that her mental illness will not respond to treatment and will not substantially improve. Here, the competent medical opinion did not reach the conclusion required by the statute. Under the evidence presented, the finding that Mother's illness is not treatable or that she will not substantially improve is not based upon medical science, but rather on economic reasons of the expense associated with the treatment. The language of the statute is clear and unambiguous and does not include a financial component.

¶ 3 The Section 7006–1.1(A)(13)(e) finding here rests upon a presumption or inference, which lacks a foundation based on sound medical evidence. Moreover, the inferred or presumed finding does not necessarily follow from the evidence presented. This raises the issue of whether Mother has been denied

---

**5.** 10 O.S.2001 § 7006–1.1(A)(12) provides that a court may terminate parental rights based on a finding that:

  a. the child has been adjudicated deprived;

  b. custody of the child has been placed outside the home of a natural or adoptive parent, guardian or extended family member;

  c. the parent whose rights are sought to be terminated has been incarcerated;

  d. the continuation of parental rights would result in harm to the child based on consideration of the following factors, among others:

the duration of incarceration and its detrimental effect on the parent/child relationship; any previous incarcerations; any history of criminal behavior, including crimes against children; the age of the child; the evidence of abuse or neglect of the child or siblings of the child by the parent; and the current relationship between the parent and the child and the manner in which the parent has exercised parental rights and duties in the past; and

  e. termination of parental rights is in the best interests of the child.

Due Process of Law. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *see In re Wright*, 1974 OK 84, 524 P.2d 790. The termination by presumption may be efficient but the "Constitution recognizes higher values than speed and efficiency." *Stanley*, 405 U.S. at 656, 92 S.Ct. at 1215.

¶ 4 Thus, I find an absence of clear and convincing evidence as to the Section 7006–1.1(A)(13)(e) component of the State's burden. I would hold it to be error to terminate Mother's parental rights pursuant to Section 7006.1.1(A)(13).

¶ 5 In Father's case, the Majority has overlooked the fact that Father was to be released from prison in February 2007, or less than five months from the date of the appellate briefs. The duration of incarceration is a factor to be considered. 10 O.S. 2001, § 7006–1.1(A)(12)(d). There is no evidence in the record of Father being unable to care for the children. Therefore, it was error to terminate Father's parental rights.