2012 OK CIV APP 41

**In the Matter of L.M., an alleged Deprived Child.**

**Rebecca Mireles and James Moody, Appellants,**

**v.**

**The State of Oklahoma, Appellee.**

**No. 109,290.**

Court of Civil Appeals of Oklahoma, Division No. 3.

March 30, 2012.

D. Michael Haggerty, II, Haggerty Law Office, PLLC, Durant, Oklahoma, for Appellant, Rebecca Mireles.

Whitney Paige Kerr, Durant, Oklahoma, for Appellant, James Moody.

Julie Cuesta Naifeh, District Attorney's Office, Durant, Oklahoma, for Appellee.

Mary Kay Nabors, Durant, Oklahoma, for Minor Child.

WM. C. HETHERINGTON, JR., Judge.

¶ 1 In this consolidated appeal, the biological parents of L.M. appeal a trial court judgment terminating their parental rights based on separate jury verdicts finding: (1) Rebecca Mireles (Mother) has a mental illness, and (2) both James Moody (Father) and Mother have failed to correct the condition which led to L.M.'s deprived status. The termination order as to Mother is REVERSED and REMANDED for a new trial. Because the order is supported by clear and convincing evidence, it is AFFIRMED as to Father, but REMANDED to correct a deficiency in the termination order.

## STANDARD OF REVIEW

¶ 2 "In parental termination cases, the State must show by clear and convincing evidence that the child's best interest is served by the termination of parental rights." *In re C.D.P.F.*, 2010 OK 81, ¶ 5, 243 P.3d 21, 23. This standard of proof "balances the parents' fundamental freedom from family disruption with the state's duty to protect children within its borders." *Id.* Our review must find the presence of clear and convincing evidence to support the trial court's decision, which requires we canvass the record [1] to determine if the evidence is such that a fact finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *Id.*

## FACTS

### Pre–Deprived Adjudication

¶ 3 According to testimony at trial, Mother and Father had been in an off and on relationship for numerous years when L.M. was born August 8, 2005. They continued that relationship until June 1, 2007, when the trial court granted a protective order for Mother and L.M. and ordered Father "to have no contact ... either in person or by telephone" with them until June 1, 2010. On July 5, 2007, the Department of Human Services (DHS) received its first referral of Mother's alleged substance abuse and slapping of L.M., who was almost two years old. After investigating, DHS recommended only preventative services for Mother because she and L.M. were living with the maternal grandmother.

¶ 4 On July 29, 2007, Mother, who had since moved with L.M. into a rental home, called the City of Durant Police Department to report a footprint inside her refrigerator. Upon arrival, the police found an unsanitary home with narrow trails between piles of trash and clothing, utilities shutoff from nonpayment, spoiled food, cockroaches, and L.M. playing in the floor. When the Police Chief told Mother the suspected footprint was just a stain which needed to be cleaned like the rest of house, she became angry and "almost explosive." At that point, the Police Chief told Mother he was making a report to the DHS, and both officers left.

---

1. We did not review Petitioner's Exhibit No. 1, included in the exhibit envelope from the January 27–28, 2011 jury trial, because its admission was rejected.

¶ 5 Later that day, a DHS investigator and caseworker went to Mother's home to initiate preventative services. They confirmed the home's condition, found some canned goods but no clean food preparation surface, and reported Mother looked ill, appeared to be over-medicated, and demonstrated "paranoid erratic behaviors." During the visit, Mother told the caseworker to leave, so she did. The investigator tried unsuccessfully to reason with Mother, concluded the child was not safe, and went outside to have the caseworker call authorities. Mother grabbed L.M. and tried to leave with him but her car stalled. When the police arrived, Mother handed L.M. to the caseworker and walked away. Because Father was currently in the Johnston County Jail, DHS obtained emergency custody of L.M.

¶ 6 On August 6, 2007, the Bryan County District Attorney filed a petition on behalf of the State of Oklahoma (State) against both parents, alleging L.M. was a deprived child because he "has been exposed to inadequate and dangerous shelter and has not been provided with adequate nutrition. That the mother's paranoid erratic behaviors is also placing the child is (sic) at risk of harm." One month later, DHS created an Individualized Service Plan (ISP or treatment plan), signed by both parents and filed in the deprived child proceeding October 2, 2007.

¶ 7 The "Condition(s) to be corrected" identified in the ISP were "[Father] and [Mother] mental stability and responsibility to maintain a safe and stable living environment. Both parents will address erratic and dangerous behaviors including domestic violence, and behavior outburst when they are frustrate[d]." The ISP list of "To Do's" ("ISP requirements") for Mother included:

Complete mental health and substance abuse assessments, follow all recommendations for those services including individual, group and recovery counseling; Address coping skills, anger, outbursts, and L.M.'s emotional difficulty directly related to his high level of anxiety; Maintain sobriety, complete random drug screening; Seek medical attention from one service provider to verify Mother's need for numerous medications; Keep a safe home without physical or verbal fights when child is present, attend family violence counseling, parenting skills training, and provide a stable and safe home with working utilities, adequate space and food; Meet L.M.'s daily and basic needs while remaining mentally stable and no exposure to anyone abusing mood altering substances.

Father's ISP requirements were identical except for the one physician limitation and he needed to "follow through with services . . . in criminal court case" and "seek and maintain legal employment as needed to pay for fines and court cost[s]." The ISP allowed the parents bi-monthly visitation with L.M.

¶ 8 Each parent had court-appointed counsel on October 9, 2007, when they stipulated to the allegations in the deprived child petition.[2] An Adjudication and Disposition Order filed October 24, 2007, found L.M. was deprived because he lacked proper parental care and guardianship, lived in an unfit home, was exposed to inadequate and dangerous shelter, had not been provided adequate nutrition and "the mother's paranoid erratic behaviors had also placed him at risk of harm." The trial court ordered the parents to correct those conditions by following the treatment plan it expressly adopted as to each parent and warned their failure to correct the conditions may result in termination of their parental rights.

*Post-adjudication*

Parents' First Progress Report

¶ 9 The ISP progress report submitted January 2008 stated Mother was making rea-

2. After L.M. was removed from Mother's custody in July, his first foster family kept him for two months. The record includes a two-page letter filed October 9, 2007, which Mother, Father and L.M.'s paternal and maternal grandmothers had signed on September 14, 2007, complaining that during their August visit, L.M. had a burn on his wrist, a bruise on his cheek, did not appear to be eating, and had been placed on a "nerve depressant." L.M. was subsequently transferred to a second foster family with whom he resided throughout these proceedings. At trial his foster mother testified L.M. "was a little bit withdrawn" upon his arrival, a month later they weaned him off of the medication and "he came alive."

sonable efforts to address her treatment plan and maintaining frequent contact with the child welfare worker. It also reported she has "numerous disabilities such as arthritis, bipolar disorder, post traumatic stress disorder and major depression," was now seeing only one physician, but had denied "having another domestic violence altercation with [Father]" which "can be verified [she] had [him] arrested at Shekinah Counseling Agency." The report stated Father had initiated counseling services, but was arrested November 20, 2007 and currently in Bryan County Jail "after being sentenced . . . for Domestic Violence involving [Mother], and would be transported to Lexington in custody of Department of Corrections (DOC)." It also reported Father "currently is not receiving services" because he was in jail, and "visitation has been ceased as a result of a standing court ordered (sic) not allowing contact until 2010."

¶ 10 Two letters from Shekinah Counseling Agency, both dated September 14, 2007, were part of the first ISP Progress Report. Father's evaluation disclosed anger management and *substantial* drug and alcohol abuse for which out-patient group counseling and parenting skills were recommended twice weekly for a minimum of 16 weeks. Mother's evaluation yielded *moderate* drug and alcohol abuse and positive tests for several prescription drugs with out-patient group counseling once weekly for sixteen weeks and random urinalysis testing recommended.

¶ 11 The parents appeared with their court-appointed counsel at the January 2008 Review Hearing. The trial court accepted DHS recommendations and report and in the "Additional Orders" section of its form order, wrote "[Father's counsel] moves for visitation w[ith] Father and a treatment plan to work while incarcerated. St[ate] objects. Request for visitation Denied. Exception allowed. Counsel Discharged."

Parents' Status March 2008—March 2009

¶ 12 Mother's mental instability was the sole issue affecting her ability to make reasonable efforts between March 2008 to March 2009,[3] in which report, DHS found "Efforts to reunite has (*sic*) failed and [it] will be seeking termination." The reports for the same period noted Father is incarcerated and "not receiving services" and that L.M. was a happy toddler with the same foster family since October 2007, his language had improved, and Mother displayed him love and attention at the DHS-monitored weekly visitations. The *status quo* was maintained at each review hearing, none of which Mother missed.

Parents' Status May 2009—October 2010

¶ 13 Father was released from prison May 9, 2009 and two days later reported to DHS, where his caseworker copied the treatment plan and "went through it with him step by step," explaining he "needed to begin it as soon as possible" because L.M. had been out of the home for a total of 22 months and DHS "was looking at termination." Father reported he was residing with L.M.'s maternal grandmother.

¶ 14 The June 2009 ISP Progress Report noted Father was "Non-compliant" under each plan requirement, "had failed to begin any services since his release" and "would not be able to see the child because a protective order is in effect until June 1, 2010 for [L.M.] and [Mother]." It further noted "Mother [is] still attempting to address issues on her court ordered ISP, but *her mental stability would be very detrimental to the child* if we were to place [L.M.] in her home" and "Efforts to Reunite Failed."

¶ 15 In September 2009, DHS requested termination of rights to both parents, explaining "[Mother] has several mental health issues that need to be addressed which is a major concern in her parenting abilities. As for [Father], he has not completed any services on the Court Ordered ISP plan."[4] At

---

3. In each report, DHS requested longer periods between reviews to allow her "to gain mental stability," described as "confused thinking and depression . . . verbally and emotionally overwhelmed . . . at times she demonstrates delusional situations."

4. The report stated Mother "continues delusional thinking," was still "on medication for several different disabilities and her mental health," she "truly loves her child but is unable to meet his needs due to her mental health issues," and a new psychological evaluation had identified "six-

a review hearing, the trial court found that "reasonable efforts to reunite have failed" for both parents.

¶ 16 In November 2009, DHS reasserted its prior recommendation and requested no visitation with the parents, because (1) "[n]either parent has corrected the conditions which led to L.M.'s removal from their care and custody"; (2) Mother's "several mental health issues ... is a concern in her parenting abilities"; and (3) Father "has not completed any services on the ISP plan." The report added "[Mother] has not completed services on her ISP at this [time] *due to her mental health status*" and Father was not living in an appropriate home for L.M. and still had not attended any domestic violence, parent or substance abuse services. The trial court agreed with DHS at the review hearing and ceased visitation. He also *sua sponte* reappointed L.M.'s former CASA (court appointed special advocate) and the former attorneys for Mother and Father and confirmed its previous "failed efforts to reunite" finding.

¶ 17 The December 2009 review hearing was continued until January 2010, and one was held every sixty days thereafter through October 2010. All of the ISP progress reports indicated little change to Mother's mental status and that Father had made progress with some ISP requirements but none with others.

### Termination Proceedings

¶ 18 State filed separate "Applications to Terminate" the parental rights to L.M. November 3, 2010. Its Application against Mother was based on "10A O.S. § 1–4–904(B)(5)," *i.e.,* she had "failed to correct the conditions that led to the finding of deprivation" although given over three months to do so, and "10A O.S. § 1–4–904(B)(13)," *i.e.,* she "has a *diagnosed behavioral health condition* which renders her incapable of adequately and appropriately exercising her parental rights, duties and responsibilities." Finally,

the Application alleged "10A O.S. § 1–4–902(A)(1)," *i.e.,* "[t]he child has been in foster care for 15 of the last 22 months." Only § 1–4–904(B)(5) and § 1–4–902(A)(1) were alleged against Father.

¶ 19 At the review hearing held in November 2010, Mother and Father appeared with counsel and requested a jury trial, which was set for January 27, 2011. Three weeks before trial, Father's counsel filed numerous motions. The motion filed January 5, 2011 sought recusal of the assigned judge after Father's *in camera* request to disqualify had been declined. Father alleged the same judge presided and sentenced him to serve three years for violating the conditions of his four-year suspended sentence in CF–2006–6 (Domestic Abuse/Assault and Battery) by committing a second offense of domestic abuse, CF–2006–863, and other violations. The recusal motion further alleged "the listed witnesses in [Father's criminal] case ... [and] ... the facts in the criminal case will be a part of [State]'s case in chief in the case at bar." According to the record, the judge denied Father's motion the same day explaining he would not be the fact-finder because the case was set for jury trial.

¶ 20 On January 11, 2011, Father filed an appeal of the denial of his recusal motion to the Chief Judge of Bryan County and a motion to strike certain allegations within State's Application to Terminate. In the latter, Father argued, due to legislative amendments in 2009, § 1–4–904(B)(5) no longer required a finding that the condition which led to the adjudication of the child as deprived "is caused by or contributed to by acts or omissions of the parent," and the "ground to terminate" based on a child's foster care placement for 15 of the most recent 22 months had been *deleted* from § 1–4–904(B).

¶ 21 Father's recusal appeal was denied by order filed January 12, 2011. The next day Father's counsel moved to sever the parents' jury trial, arguing he and Mother had mutually antagonistic defenses and he might be

---

teen risk factors," e.g., due to "severity of [Mother's] mental health she continues to pose a risk of harm to herself and her child." The report noted Father and several others still lived together, he had only two mental health appointments

since his release, he canceled his follow-up appointment "due to not having a ride," and had "not worked any domestic violence, parenting or substance abuse services."

double-teamed by her and State at a joint trial. At the January 25, 2011 hearing on Father's motions to strike and to sever the trial, State agreed to make Father's requested changes to the termination applications, counsel for both parents indicated they would not contest the amendments, and Father's severance request was denied.

### Parents' Jury Trial

¶ 22 Two days before trial, State filed separate amended applications to terminate the parental rights of Mother and Father, making the agreed upon changes. The jury trial was held over two days, January 27–28, 2011, during which State presented testimony from 14 witnesses, including the police who made the July 2007 referral, DHS investigators and caseworkers, licensed professional counselors, L.M.'s maternal grandmother and his foster parents. All but one of State's exhibits were admitted into evidence, including the parents' ISP, the October 2007 Adjudication/Disposition Order, two letters from Mother's counselor, and one letter from Father's counselor.

¶ 23 The caseworkers all testified both parents had failed to correct the conditions during the separate periods they each were assigned to L.M.'s deprived child case. The testimony of the first caseworker who prepared the parents' treatment plan gave a very general description of Mother's condition, i.e. anxiety or a breakdown, "not focused on her getting better" and taking "numerous medications for health issues."

¶ 24 The second caseworker twice testified Mother "initiated services" on her treatment plan "but never completed [any] due to her mental state" and "due to her mental capabil-

ities she could not finish." She further testified based on her own observations, Mother "wasn't able to care for herself so—she wouldn't be able to care for her child." Her reason for recommending termination was, "It was 2009. The ISP plan was not getting done. Her mental stability, she couldn't even put a finger on her mental stability—of her problems that she needed to look at." This testimony was confirmed by the third caseworker, who testified "[w]ith Mother, there was a lot of mental health issues. Lots of reports of mental health concerns with her" and "notes of delusional thoughts."

¶ 25 Mother's counselor from April 2009 to mid-January 2010 testified Mother was currently suffering from back and heart problems and her "significant mood disorder with active symptoms" compromises her ability to care adequately for herself and her child and poses a risk of harm for herself and her child.[5] The counselor testified Mother had disclosed she was diagnosed with bipolar disorder as a teenager and that her recent psychological evaluation "presents a somewhat similar picture of bipolar I disorder with psychotic features." Father's counselor opined Father did not "show progress or commitment to change his life from before" and did not complete the anger management and substance abuse requirements.[6]

¶ 26 After State rested its case, each parent moved for directed verdict, both of which the trial court overruled. Counsel for the parents each gave a brief opening statement, and then rested. The child's attorney also rested. Following instructions to the jury and closing statements, the issues were submitted for decision by the jury.

---

5. State's Exhibits included two letters from Mother's counselor. The May 29, 2009 letter explained she had been working with Mother since April 24, 2009 and from five sessions reported Mother was not addressing the risks outlined in her psychological evaluation, not developing coping skills, and her moods vacillated between depressed and manic states with no awareness of the change. In her opinion "[Mother] has a history of severe mental illness with sustained paranoid ideation, flight of ideas, poor emotional regulation, depression, anxiety, unpredictable behavior, lack of ability to establish appropriate boundaries, and feelings of insecurity. She continues to pose a risk of harm to

herself and her child if he should be returned to the home." The September 9, 2009 letter was identical except for her report that Mother "has shown an increased pattern of instability."

6. State admitted a letter from Father's counselor dated June 7, 2010, reporting he had a low level of drug abuse, signs of definite alcoholism, anger issues and high hostility level, limited capacity to communicate and an impaired reasoning ability. The counselor opined Father is not capable of maintaining any kind safe environment or care for a child, is not self-sufficient, and has not been able to abstain from alcohol.

¶ 27 By separate verdict forms, a unanimous jury found "by clear and convincing evidence" Mother's parental rights to L.M. should be terminated (1) "on the statutory ground that the parent failed to correct the conditions which led to the adjudication of the minor child even though she has been given over three months to do so" and (2) "on the statutory ground that the parent has a mental illness or mental deficiency." The unanimous jury's verdict against Father also found "by clear and convincing evidence" that his parental rights to L.M. should be terminated "on the statutory ground that the parent has not corrected the conditions which led to the adjudication of the minor child even though he has been given over three months to do so."

¶ 28 The trial court's "Journal Entry of Judgment Terminating The Parental Rights of Respondent Parents" filed March 22, 2011 states the jury returned its verdicts on January 28, 2011, and after quoting verbatim the three verdicts, ordered "the parental rights of [Mother] and [Father] be terminated as to [L.M.]" who is to remain in DHS custody. The parents [7] filed separate appeals from the trial court's judgment based on the jury's verdicts. By Order filed April 26, 2011, the Supreme Court consolidated their appeals pursuant to Okla.Sup.Ct.R. 1.27(d). Assignment to this Court followed.

## ANALYSIS

### Mother's Appeal

■ ¶ 29 For reversal, Mother argues the trial court's failure to properly address her motion to proceed *pro se* violated her constitutional right to represent herself at the parental rights termination trial and there was insufficient evidence presented to the jury to justify termination of her parental rights. Because we agree with Mother's latter argument as discussed below, we need not reach her constitutional argument. *In*

the Matter of J.N.M., 1982 OK 153, ¶ 1, 655 P.2d 1032, 1033.[8]

### Insufficiency of the Evidence

¶ 30 According to Mother, there is no evidence that allowing her "to retain her parental rights" would result in harm or threatened harm to L.M. After admitting "State did offer evidence showing a danger of harm to L.M.," she clarifies that "State's evidence, tracking the statutory language of 10A O.S. § 1–4–904(B)(13), only showed a danger to L.M. *if he were returned to Mother's custody*." (Emphasis in original.) She contends State did not prove or even allege L.M. was being harmed or in danger of harm "if the *status quo* were to remain in place or if Mother were granted visitation."

¶ 31 State argues it presented clear and convincing evidence of harm to L.M., noting also the § 1–4–904(B)(13) element is the only one with which Mother takes issue. Mother contends State's response ignores *Matter of Sherol A.S.*, 1978 OK 103, 581 P.2d 884, and other Oklahoma cases she cited for holding harm to the child must be proven to justify State's interference with a parent-child relationship. She argues, "given the constitutional nature of this requirement" that "the legislature is incapable of removing or modifying it by statutory enactment" and her directed verdict motion should have been sustained because "State made no effort to prove L.M. would ever be harmed by the *status quo*."

### Preliminary Issues

■ ¶ 32 The problem revealed by the record and not acknowledged by either party is that the jury was not instructed on the amended statute, § 1–4–904(B)(13). Instead, the instruction sets out *verbatim* the elements of its predecessor, 10 O.S.2001 § 7006–1.1(A)(13), which was amended and renumbered to § 1–4–904(B)(13) as part of

---

7. Father's appellate court-appointed attorney did not represent him below.

8. "When, as here, legal relief clearly is affordable upon alternative grounds, consideration of constitutional challenges is inappropriate in light of [this Court's] self-erected 'prudential bar' of restraint. Constitutional questions should not be

reached in advance of strict necessity." *Reimers v. State ex rel. Department of Corrections*, 2011 OK CIV APP 83, ¶ 29, 257 P.3d 416, 421 (quoting *Russell v. Board of County Commissioners of Carter County, Oklahoma*, 1997 OK 80, ¶ 32, 952 P.2d 492, 504).

the Legislature's substantial amendments to Title 10 and recodification of the Oklahoma Children's Code (OCC) under Title 10A, effective May 21, 2009.[9]

¶ 33 Mother's insufficiency of the evidence argument on appeal does not directly raise any error with the jury instruction as given. Nor did she challenge State's termination petition based on § 1–4–904, even after Father's motion to strike allegations from State's petition specifically addressed the amendments. At trial, Mother only challenged the sufficiency of the evidence for § 1–4–904(B)(13)[10] and she did not object to the "proposed jury instructions," as corrected, or later to the trial court's "No. 18."[11] We find no on-the-record discussion about a *sua sponte* change to that instruction in the trial transcripts.

■■■ ¶ 34 The trial court's duty is to state the law correctly. *Sellars v. McCullough*, 1989 OK 155, ¶ 9, 784 P.2d 1060, 1062. It is the parties' duty to assure that the instructions given accurately reflect the issues tendered by the evidence adduced at trial, and if not, make an objection complying with 12 O.S.2001 § 578. *Id.* Appellate courts may, however, review a jury instruction that was neither properly preserved below nor addressed on appeal for "fundamental errors of law." *Sullivan v. Forty–Second West Corp.*, 1998 OK 48, ¶¶ 3–4, 961 P.2d 801, 802–803. Fundamental error "compromises the integrity of the proceeding to such a degree that *the [jury instruction] has a substantial effect on the rights of one or more of the parties.*" (Emphasis added.) *Id.*, ¶ 7; *see also Quarles v. Panchal*, 2011 OK 13, ¶ 7, 250 P.3d 320, 322.

¶ 35 Jury Instruction No. 18, on its face, correctly states the law *prior* to May 21, 2009, *i.e.*, § 7006–1.1(A)(13), which authorized a termination of parental rights to a child upon "[a] finding that all of the following exist":

> (a) the child has been adjudicated deprived; and
>
> (b) custody of the child has been placed outside the home of a natural or adoptive parent, guardian or extended family member; and
>
> (c) the parent whose rights are sought to be terminated has a mental illness or mental deficiency, as defined by [43A O.S. § 6–201],[12] which renders the par-

9. As relevant here, the Legislature deleted one of § 7006–1.1(A)'s fifteen grounds for termination and moved the amended fourteen "legal grounds" to a newly added section B. Section 1–4–904(A) now provides "[a] court *shall not* terminate the rights of a parent to a child unless: (1) the child has been adjudicated to be deprived either prior to or concurrently with a proceeding to terminate parental rights; and (2) termination of parental rights is in the best interest of the child." (Emphasis added.)

10. When moving for directed verdict at the close of State's case in chief, Mother's counsel referred to "the statute which appears in the amended complaint" and "10A, [§ ]1–4–904" when arguing there was *no evidence* "Mother had been diagnosed with a cognitive disorder" and that "actual harm or harm would occur in the near future if her *parental rights* were *not terminated.*"

11. The transcripts reveal each parent's counsel and State acknowledged receipt of copies of the trial court's "proposed instructions" and after agreeing to some minor changes, no further objections were made. In the presence of the parties, the trial court numbered the instructions, announcing each corresponding Oklahoma Uniform Jury Instruction (OUJI) number, and relevant here, he stated "Number 18 is [OUJI] 3.18." Our research shows "OUJI No. 3.18" is from the

"Oklahoma Jury Instructions–Juvenile" approved March 28, 2005, which lists the elements of § 7006–1.1(A)(13). *See In re Oklahoma Uniform Jury Instructions for Juvenile Cases*, 2005 OK 12, 116 P.3d 119, 153 ("Mental Illness or Mental Deficiency"). New jury instructions based on the 2009 amendments to § 1–4–904 were approved by the OUJI–Juvenile committee March 19, 2010, modified several times with final modification January 21, 2011, and adopted by the Supreme Court April 18, 2011. *See* http://www.oscn.net/forms/lawlibrary/Juvenile–2011/adobe/Chapter03.pdf. Therefore, when the jury trial in this case was held January 27–28, 2011, the available OUJI-juvenile for termination proceedings still had the § 7006–1.1(A) termination grounds. We assume 12 O.S.2011 § 577.2's requirement to use OUJI when applicable in civil cases "giving due consideration to the facts and the prevailing law" would also apply to the special statutory proceeding involved here.

12. 43A O.S. Supp.2005 § 6–201(f) and (g) provides:

"Mental illness" shall mean mental disease to such extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community.

"Mental deficiency" shall mean mental deficiency as defined by appropriate clinical au-

ent incapable of adequately and appropriately exercising parental rights, duties and responsibilities; and

(d) the continuation of parental rights would result in harm or threatened harm to the child; and

(e) the mental illness or mental deficiency of the parent is such that it will not respond to treatment, therapy or medication and, based on competent medical opinion, the condition will not substantially improve; and

(f) termination of parental rights is in the best interests of the child.

Provided, a finding that a parent has a mental illness or mental deficiency shall not in and of itself deprive the parent of his or her parental rights.

¶ 36 State moved to terminate Mother's parental rights based on § 1–4–904(B)(13), which, since May 21, 2009, requires "[a] finding that all of the following exist":

a. the parent has a diagnosed cognitive disorder, an extreme physical incapacity, or a medical condition, including behavioral health which renders the parent incapable of adequately and appropriately exercising parental rights, duties, and responsibilities within a reasonable time considering the age of the child, and

b. allowing the parent to have custody would cause the child actual harm or harm in the near future.

A parent's refusal or pattern of noncompliance of treatment, therapy, medication or assistance from outside the home can be used as evidence that the parent is incapable of adequately and appropriately exercising parental rights, duties, and responsibilities.

A finding that a parent has a diagnosed cognitive disorder, an extreme physical in-

capacity, or a medical condition, including behavioral health or substance dependency shall not in and of itself deprive the parent of parental rights.

In addition, two § 7006–1.1(A)(13) elements,[13] i.e., "the child has been adjudicated deprived either prior to or concurrently with a proceeding to terminate parental rights," and "termination is in the best interest of the child," apply to § 1–4–904(B)(13) and all other termination grounds under § 1–4–904(B).[14] See 10A O.S.2011 § 1–4–904(A)(1)–(2).

¶ 37 Although § 7006–1.1(A)(13) was in effect when State commenced its deprived child proceeding against Mother in 2007, it had been superceded by § 1–4–904(B)(13) well over a year before the Application to terminate was filed November 3, 2010. Statutory amendments to other termination grounds, prior to and after the State had moved to terminate parental rights, have been addressed by five Oklahoma Court of Civil Appeals cases with varying results.

¶ 38 By published opinion, the Court in Matter of J.C., 2010 OK CIV APP 138, n. 2, 244 P.3d 793, 794, disagreed with the mother's argument her pre-May 21, 2009 stipulation to the deprived child petition required application of the former "failure to correct" ground, 10 O.S.2001 § 7006–1.1(A)(5), finding the second amended petition to terminate her parental rights "was filed June 10, 2009, which is subsequent to the effective date of Title 10A [May 21, 2009]." The Oklahoma Court of Civil Appeals in the Matter of T.M., A.M. & A.M., 2000 OK CIV APP 65, 6 P.3d 1087, and Matter of A.G. & E.G., 2000 OK CIV APP 12, 996 P.2d 494, affirmed or found no fundamental error with the trial court's application of 10 O.S. Supp.1998 § 7006–1.1(A)(15),[15] which newly enacted ground

---

thorities to such extent that a person so afflicted is incapable of managing himself and his affairs, but shall not include mental illness as defined herein.
We note for the record the jury was also given an instruction with these definitions.

13. The same elements were previously found under § 7006–1.1(A)(5), failure to correct the conditions, and § 7006–1.1(A)(12), incarceration of a parent.

14. The current OUJI–Juvenile, Chapter 3, Grounds for Termination—Introductory Note, explains these two elements have been added to all grounds § 1–4–904(B).

15. Section 7006–1.1(A)(15) authorized termination when the child has been in foster care for 15 out of the most recent 22 months. When the Legislature amended § 7006–1.1, effective May 21, 2009, § 7006–1.1(A)(15)'s text was deleted

went into effect *after* the deprived child adjudications and *before* the motions to terminate were filed in each case.

¶ 39 The basis for *Matter of T.M.* and *Matter of A.G.*, *id.*, was the Legislature's *express* provision for retroactive application of that ground, the same interpretation reached by the Oklahoma Court of Civil Appeals in the *Matter of M.C. and N.C.*, 1999 OK CIV APP 128, 993 P.2d 137. Notwithstanding this interpretation, the latter Court reversed the termination order, finding § 7006–1.1(A)(15), as applied to its facts, had "a type of *ex post facto* effect forbidden by the Oklahoma Constitution [Art. 2, § 15]," *i.e.*, a "punitive consequence that did not exist either at the time State initiated the deprived proceedings, or when State began its quest to terminate" and had changed the father's obligations and liabilities.[16] *Id.*, ¶ 7–8.

¶ 40 Recently, another division of the Oklahoma Court of Civil Appeals in a published opinion, *Matter of P.W.W., L.M.W., N.W. & S.W.*, 2012 OK CIV APP 18, 273 P.3d 83, (2012), addressed the Legislature's "repeal" [17] of § 7006–1.1(A)(15), which became effective May 21, 2009, *i.e.*, after the 2007 adjudication order and prior to the November 2009 motion to terminate which had alleged two grounds, § 7006–1.1(A)(15) and § 7006–1.1(A)(5). The trial court instructed the jury solely on § 7006–1.1(A)(15), with no objection by Mother, so the Court in *P.W.W.* reviewed the instruction for fundamental error. Interpreting Art. 5, § 54, Okl. Const., which provides the "repeal of a statute shall not … affect any accrued right, or penalty incurred, or proceedings begun by virtue of

such repealed statute," the Court in *Matter of P.W.W.* found the termination proceeding was the "proceedings begun" by virtue of the repealed statute. Because State's motion to terminate was filed after § 7006–1.1(A)(15)'s repeal, the Court found fundamental error based on the trial court's lack of authority to terminate parental rights on the repealed ground. The Court reversed the termination order for failure to give an instruction for the order's remaining basis, § 7006–1.1(A)(5).

¶ 41 The trial court here did not instruct on either a new or amended termination ground, but instead on the former version. Whether such action constitutes fundamental error is dependent on the same issue addressed in all five cases—which version governed State's termination proceeding. This question of law is reviewed *de novo*, without deference to the trial court's conclusion. *In re Adoption of Baby A.*, 2006 OK CIV APP 24, ¶ 7, 131 P.3d 153, 155.

¶ 42 The general rule in Oklahoma is that statutes and amendments are to be construed to operate only prospectively unless the Legislature clearly expresses a contrary intent. *Welch v. Armer*, 1989 OK 117, ¶ 27, 776 P.2d 847, 850. Remedial or procedural statutes "which do not create, enlarge, diminish, or destroy *accrued or contractual* rights—are generally held to operate retroactively and apply to pending proceedings (unless their operation would affect *substantive rights* )." *Cole v. Silverado Foods, Inc.*, 2003 OK 81, ¶ 8, 78 P.3d 542, 546. (Emphasis added.)

¶ 43 Unlike the termination ground considered in *Matter of T.M.*, *Matter of A.G.*, and

---

and replaced with the new text now found in § 1–4–904(B)(14).

16. The Court in *T.M.* found the facts in *Matter of M.C. and N.C.* distinguishable. First, § 7006–1.1(A)(15) became effective *after* the filing of the first termination petition for failure to correct, the trial of which ended in a mistrial, and the father had only two weeks notice before the retrial that the new ground had been added. Second, when the father asserted his right to a jury trial, his children had only been in foster care 12 months and the only reason the requisite 15 months under the new ground was satisfied was due to the court's delay in scheduling his trial. The Court in *T.M.* found the mother was

given reasonable notice and that her children had been in foster care 15 months *prior* to the motion to terminate so her asserted right to a jury trial did not contribute to satisfaction of the statutory period in foster care.

17. We find no express repeal of § 7006–1.1(A)(15). However, the Legislature's amendment of § 7006–1.1(A) and renumbering it as § 1–4–904(B), as part of its recodification of the OCC, without § 7006–1.1(A)(15) included as a legal ground, may be viewed as an *implied* repeal by an amendatory act. *Hendrick v. Walters*, 1993 OK 162, ¶ 13, 865 P.2d 1232, 1240; *Lankford v. Menefee*, 1914 OK 651, ¶ 3–4, 145 P. 375, 376–377.

*Matter of M.C., supra,* we find no legislative intent, express or necessarily implied, for retroactive application of § 1–4–904(B)(13). Under the general rule, operation of the amended statute would be prospective only, unless one of its exceptions applies. This determination requires a comparison of both versions to identify any changes to existing law, and if so, whether the changes are purely remedial or procedural, in which case the amended statute would operate retroactively. *American Airlines Inc. v. Crabb,* 2009 OK 68, ¶ 14–16, 221 P.3d 1289, 1292–93; *Welch,* 1989 OK 117, ¶¶ 21–26, 776 P.2d 847. If the changes are substantive, its operation is prospective only. *Id.*

¶ 44 Comparing § 7006–1.1(A)(13) to § 1–4–904(B)(13), we conclude there are significant changes in the amended version *other than* the broadening of its scope, *i.e.,* cognitive disorders, extreme physical incapacities and "medical conditions, including behavioral health" [18] (collectively, "conditions"). Relating to Mother's insufficiency of the evidence argument is the change in the element addressing the potential for "harm" to the child. Section 1–4–904(B)(13)(b) now provides "allowing the parent *to have custody* would cause the child actual harm or harm in the near future," but before May 21, 2009, § 7006–1.1(A)(13)(d) required "the *continuation of parental rights* would result in harm or threatened harm to the child." [19] (Emphasis added.)

¶ 45 Another significant change is the Legislature's deletion of § 7006–1.1(A)(13)(e), which required testimony or evidence from a physician, psychiatrist/psychologist, counsel-or or other qualified person that the parent's mental illness or deficiency "is such that it will not respond to treatment, therapy or medication and, based upon competent medical opinion, the condition will not substantially improve." This latter section was merged with § 7006–1.1(A)(13)(c), from which the statutory definition of mental illness or mental deficiency was deleted, into a single element, § 1–4–904(B)(13)(a). That section now requires a "diagnosis" for the listed conditions, without regard to the parent's prognosis, short-term or long-term. Like § 7006–1.1(A)(13)(c), the *conditions* listed in § 1–4–904(B)(13)(a) must still "render the parent incapable of adequately and appropriately exercising parental rights, duties and responsibilities." However, while this finding has an added qualification, "within a reasonable time considering the age of the child," it can now be proven with evidence of a parent's "refusal or pattern of non-compliance of treatment, therapy, medication or assistance from outside the home." [20] As a result, § 1–4–904(B)(13) provides a lesser evidentiary burden that is more subjective than its predecessor.

¶ 46 The history of § 7006–1.1(A)(13) demonstrates the significance of the changes to its elements, which are identical to those in 10 O.S. Supp.1988 § 1130(8)-the first termination ground specific to parents with mental illness or deficiency.[21] The Legislature enacted § 1130(8) in response to *Matter of J.N.M.,* 1982 OK 153, 655 P.2d 1032, in which the Supreme Court reversed a termination order finding the 1981 version of § 1130 did

---

**18.** Only the term "behavioral health" is defined by 10A O.S. Supp.2009 § 1–1–105(6). When used in OCC, the term means "mental health, substance abuse or co-occurring mental health and substance abuse diagnoses, and the continuum of mental health, substance abuse or co-occurring mental health and substance abuse treatment."

**19.** "Custody" is not specifically defined under the OCC, but 10A O.S.2011 § 1–4–906(A) and its predecessors have long identified the "right to custody" as just one of several, specific "parental rights" in an existing parent-child relationship. *See also Matter of Catlett,* 1975 OK 161, ¶ 4, 543 P.2d 552, 554.

**20.** It is clear from the newly-added paragraph and the statutory definition of "behavioral health" that § 1–4–904(B)(13) resulted from the Legislature's merger of § 7006–1.1(A)(13) with § 7006–1.1(A)(14), which allowed termination based on a parent's *resisted* treatment for their abusive and chronic use of drugs or alcohol.

**21.** *Matter of L.S.,* 1990 OK CIV APP 94, 805 P.2d 120; *see also Matter of C.R.T.,* 2003 OK CIV APP 29, ¶ 30, 66 P.3d 1004, 1010 (holding "the Legislature singled out the mental health 'condition' for special treatment in [§ 7006–1.1(A)(13)]" and "has thereby created a special provision controlling over the more general provision of [10 O.S. Supp.2000 § 7006–1.1(A)(5)]," *i.e.,* failure to correct conditions leading to a deprived adjudication).

not expressly provide for parental rights termination of mentally ill parents and proof of mental illness alone was inadequate to terminate parental rights. As enacted, § 1130(8) addressed all of the Court's concerns, *e.g.*, no evidence on whether the parents' mental illness posed harm to the children or whether the mental illness was not treatable and long-term which would justify termination.

¶ 47 "Termination of parental rights is purely a creature of statute." *Matter of Christopher H.*, 1978 OK 50, ¶ 7, 577 P.2d 1292, 1293. A "statute of creation" is one creating a right previously unknown to both common law as well as statutory law. *Trinity Broadcasting Corp. v. Leeco Oil Co.*, 1984 OK 80, ¶ 9, n. 8, 692 P.2d 1364, 1367. Section 1130(8), later renumbered to § 7006–1.1(A)(13) without any modifications to the six elements or the proviso, clearly meets that definition. While this new ground gave State the right or authority to terminate the parental rights of parents with a mental illness or deficiency upon the requisite proof of all of its elements, it also provided statutory protection for the parental rights of the same parents.[22] A statute of creation affects substantive rights and any amendment to such only operates prospectively.[23] *Trinity*, 1984 OK 80, ¶ 9, 692 P.2d 1364.

¶ 48 We find no Oklahoma parental termination cases deciding whether substantive rights are affected by an *amended* ground's changes to the prior version's elements. However, we find two worker's compensation court cases instructive on this issue. In *American Airlines Inc. v. Crabb*, 2009 OK 68, ¶ 14–16, 221 P.3d 1289, 1292–93, the Court found the addition of the phrase "major cause of the injury" in the amended statutory definition of "compensable injury" added a new element to the claim, intruded on substantive rights, and could not be applied retroactively. After-enacted legislation that "alters the elements of a claim or defense by imposition of new conditions affects the parties' substantive rights and liabilities." *King Manufacturing v. Meadows*, 2005 OK 78, ¶ 19, 127 P.3d 584, 590; *Welch*, 1989 OK 117, ¶¶ 27–28, 776 P.2d 847.

¶ 49 The Court in *Cole v. Silverado Foods Inc.*, 2003 OK 81, ¶ 13, 78 P.3d 542, 548, similarly held the retroactive application of an amended statute of limitations affected the substantive rights of both parties in two ways. First, it made the employer's defense "much more extensive than it stood at the time the claim was brought." Second it affected the merits or "grounds or elements" of the employee's claim, since she would have to confront a "different defense." *Id.*, ¶ 14, n. 27. Because the amended statute operated on "rights in existence," the Court in *Cole* held "its terms are subject solely to prospective application." *Id.* Similar conclusions were reached about an amended adoption without consent statute in *Adoption of W.C.*, 189 Ohio App.3d 386, 938 N.E.2d 1052 (Ohio Ct.App. 12 Dst.2010) and *VanBremen v. Geer*, 187 Ohio App.3d 221, 931 N.E.2d 650 (Ohio Ct.App. 5 Dst.2010).[24]

¶ 50 As in *Crabb*, § 1–4–904(B)(13) adds new elements and its application to Mother's termination proceeding would have

---

**22.** The Legislature's authority to protect parents with mental illnesses or deficiencies evolves from the same doctrine most generally applied to Oklahoma children, *i.e.*, the doctrine of *parens patriae*. This doctrine is defined as "the inherent power and authority of a Legislature of a state to provide protection of the person and property of persons *non sui juris* such as minors, insane and incompetent persons." *Matter of Baby Girl L.*, 2002 OK 9, n. 8, 51 P.3d 544, 562.

**23.** When a statutory "requirement reflects an important state policy ... the express recognition of that policy cannot be considered procedural rather than substantive." *In re Eden F.*, 741 A.2d 873, 887 (Conn.1999) (the Court held the amended statute affected substantive rights of the parties by providing *additional statutory pro-*

*tection* for any parent contesting a parental rights termination action and placing the burden on the state to take appropriate measures designed to secure reunification of parent and child.)

**24.** The Court in *Adoption of W.C.* adopted the analysis of the Court in *VanBremen* which relied on Ohio's constitutional retroactivity clause and held the revised adoption without consent statute was substantive and did not operate retroactively, because the state's legislative body did not expressly provide for such and it "places a lesser burden on the petitioner who seeks to adopt the child without the consent of the natural parent and conversely places a higher burden on the natural parent who opposes the petition."

had the same effect as discussed in *Cole, i.e.,* it would have placed a *lesser evidentiary burden* on State to terminate Mother's parental rights and a *higher burden* on Mother in opposing termination, thereby affecting the parties' substantive rights. A substantive change which "alters the rights or obligations of a party cannot be viewed as solely a remedial or procedural change and cannot be retrospectively applied." *Sudbury v. Detering,* 2001 OK 10, ¶ 19, 19 P.3d 856, 860. Therefore, as applied to this case, § 1–4–904(B)(13)'s operation is prospective only.

¶ 51 We also agree with the Court's decision in *Matter of P.W.W.* that "Art. 5, § 54, is controlling" here on the issue before us. "Proceedings begun" under the meaning of Art. 5, § 54 "refers to essential steps or measures to invoke, establish or vindicate a right." *Cole v. Silverado Foods, Inc.,* 2003 OK 81, ¶ 8, 78 P.3d 542, 546. This constitutional provision applies to repealed or amended statutes. *Cole,* ¶ 14; *Matter of A.W. & M.W.,* 2011 OK CIV APP 27, ¶ 9, n. 5, 250 P.3d 343, 347.[25] "Proceedings begun" in Art. 5, § 54 "embraces *all of the statutory steps required by law* for the establishment *and* foreclosure of a statutory lien claim" and "the timely filing of a lien statement is a condition precedent to a foreclosure." *First National Bank of Pauls Valley v. Crudup,* 1982 OK 132, ¶ 6, 656 P.2d 914, 916. Relying on *Crudup,* the Court in *Cole* held the timely filing of a workers' compensation claim "establishes an initial step with the meaning of 'proceedings begun' in Art. 5, § 54, [and] the terms of the statute in effect at the time the claim was filed are constitutionally shielded from invasion by after-enacted legislation." 2003 OK 81, ¶ 14, 78 P.3d 542.

■ ¶ 52 The point at which we depart from *Matter of P.W.W.* is its assumption the Legislature intended the "repeal" of the statutory ground to be applied retroactively to the pending deprived child action and that for purposes of Art. 5, § 54, "proceedings begun" is State's filing of a motion or petition

to terminate. Even if we were to agree the Legislature so intended (either expressly or impliedly), we conclude the filing of a petition to adjudicate a child as deprived is the initial and critical step within the meaning of "proceedings begun" in Art. 5, § 54. Like the filing of a workers' compensation claim in *Cole,* a petition for adjudication commences State's *right* to intervene in a family unit to protect a child from harm and seek *relief, e.g.,* adjudication of the child as deprived, termination of parental rights, as permitted by 10A O.S.2011 § 1–4–301(A)(2)(g), [formerly 10 O.S.2001 § 7003–3.1(A)(2)(g) ].

■ ¶ 53 A deprived child petition filed by State is also a condition precedent (together with proof of harm to the child or a stipulation by the parents) to an order adjudicating the child as deprived. Thereafter, if reunification of the family is successful, State may dismiss the deprived action. However, if reunification of the family fails or is not an option, State's decision to pursue its remedy of terminating parental rights is dependent, under either § 7006–1.1(A)(13) or § 1–4–904(B)(13), on a prior deprived child adjudication. In that event, State's petition or motion to terminate parental rights is given the same case number as the deprived action, hence its description as "ancillary" to the deprived action, *see In re C.L.M.,* 2001 OK CIV APP 3, ¶ 12, 19 P.3d 888, 891, or one of its three "stages," *see In re G.G.,* 2004 OK CIV APP 71, ¶ 15, 97 P.3d 1155, 1156. The "[e]ntire proceeding from the filing of a petition to adjudicate deprived until the matter has been completed, either by termination of parental rights or by dismissal of the action constitutes a deprived action." *Matter of T.M., A.M. & A.M.,* 2000 OK CIV APP 65, ¶ 11, 6 P.3d 1087, 1092. Applying *Cole* and *Crudup,* we conclude "proceedings begun" under the facts of this case refers to the initial filing of State's petition to adjudicate L.M. as deprived. All of the subsequent statutory steps in a deprived child pro-

---

**25.** The Court in *Matter of A.W.* explained in fn. 5 that § 1–4–904 had gone into effect *after* the jury trial began but nevertheless considered Art. 5, § 54 and found the changes in the law did not affect the pending proceeding, the "failure to correct" ground upon which the jury based its

verdict was available under the superceded and the amended version, and there was "no fundamental error in the district court's instruction of the jury based on the law in effect at the time the trial proceedings began (§ 7006–1.1(A))."

ceeding, including the petition or motion to terminate, are part of and ancillary to the deprived child proceeding. Under our interpretation, because § 7006–1.1(A)(13) was in effect at the time the petition to adjudicate was filed based on Mother's mental illness, its terms at that time are applicable to the subsequent termination proceeding and are unaffected by the intervening legislative amendment.

■■■■ ¶ 54 A parent's right to his child and family integrity is a fundamental constitutionally protected liberty interest that must be accorded the full panoply of procedural protections, as well as substantive protection under the due process clauses. *In re A.M. & R.W.*, 2000 OK 82, ¶ 8, 13 P.3d 484, 487; *Matter of J.N.M.*, 1982 OK 153, ¶ 9, 655 P.2d 1032, 1036; and *In re M.C. and N.C.*, 1999 OK CIV APP 128, ¶ 9, 993 P.2d 137, 140. We are also aware that Oklahoma courts have long held in deprived child proceedings that parental rights are *not absolute*, but are qualified by considerations affecting the welfare of children. *In re Harris*, 1966 OK 253, ¶ 0, 434 P.2d 477, 478; *In re Pulliam*, 1962 OK 56, ¶ 0, 369 P.2d 646, 647; *McNatt v. State*, 1958 OK 235, ¶ 0, 330 P.2d 600; *In re J.C.*, 2007 OK CIV APP 77, ¶ 5, 168 P.3d 784, 785. Therefore, the parents' rights must be balanced against the State's right to protect the rights of children who have an equally important right to a wholesome and safe environment. *In re J.C.*, 2007 OK CIV APP 77, 168 P.3d 784. However, the "paramount consideration in all proceedings within the [OCC] is the best interests of the child." 10 O.S.2001 § 7001–1.2(B), now 10A O.S.2011 § 1–1–102. This goal is best served by full compliance with the law. *A.E. v. State*, 1987 OK 76, ¶ 22, 743 P.2d 1041, 1048.

¶ 55 Keeping these principles in mind, § 7006–1.1(A)(13)'s statutory protection for a special class of parents with mental illness or mental deficiency applies here. This "protected condition" triggered L.M.'s removal from Mother's custody and his adjudication as a deprived child. Mother's mental illness remained the sole basis for the pending deprived action *and* was relied upon in State's application to terminate her parental rights. Because this statutory protection existed when the deprived action proceedings were begun, § 7006–1.1(A)(13)'s application is protected from extinguishment by the Legislature's 2009 amendments under Art. 5, § 54 of the Oklahoma Constitution. Accordingly, we find no fundamental error with the trial court's instruction based on § 7006–1.1(A)(13).

### Sufficiency of the Evidence Termination Under § 7006–1.1(A)(13)

■■■ ¶ 56 Having found § 7006–1.1(A)(13) governs Mother's termination proceedings, we next address her insufficiency of the evidence argument as it relates to harm to the child. Under this version, the question is whether there is clear and convincing evidence the "*continuation of* [Mother's] *parental rights* would result in harm or threatened harm to the child." We agree with Mother all of the evidence State presented demonstrated harm or threatened harm to L.M. if he were returned to her physical custody, and there is no dispute the evidence presented to the jury showed Mother's mental illness met the statutory definition as required by § 7006–1.1(A)(13)(c). However, whether there is clear and convincing evidence that *continuance* of her *parental rights* would result in harm or threatened harm to L.M., under the specific facts of this case, cannot properly be evaluated or understood without first determining whether State carried its requisite burden to show Mother's condition was long-term and not treatable, as essentially required under § 7006–1.1(A)(13)(e).

¶ 57 While performing our appellate duty to "canvass the record to determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven," we find clear and convincing evidence of Mother's "history of severe mental illness" and of her disclosure she had been diagnosed with "bi-polar disorder as a teenager." There is also testimony Mother "agreed to and signed the treatment plan that lists her diagnosis as schizophrenia," has *current* symptoms of depression and anxiety, *inter alia*, and she had yet to resolve any of the originally identified risk factors through counseling with three counselors since 2007.

¶ 58 However, review of the entire record reveals there is no testimony or evidence Mother's mental illness *will not respond* to medication or other treatment or therapy. More importantly, the record lacks competent medical opinion that Mother's mental illness *will not substantially improve.* Without clear and convincing evidence for all six of § 7006–1.1(A)(13)'s findings, the judgment terminating Mother's parental rights based on this statutory ground must be reversed.

### Sufficiency of the Evidence for Termination Under § 7006–1.1(A)(5)

¶ 59 Because the jury also found Mother's parental rights should be terminated based on her failure to correct the conditions which led to L.M.'s deprived child status, our remaining duty is to decide whether there is clear and convincing evidence to support the trial court's judgment based on this ground. Like the mental illness instruction, the jury was not instructed on the amended ground, 10A O.S. Supp.2009 § 1–4–904(B)(5), but instead its predecessor, 10 O.S. 2001 § 7006–1.1(A)(5) which, prior to May 21, 2009, allowed a trial court to terminate the rights of a parent to a child based on "[a] finding that":

(a) the child has been adjudicated to be deprived, and

(b) such condition is caused by or contributed to by acts or omissions of the parent, and

(c) termination of parental rights is in the best interests of the child, and

(d) the parent has failed to show that the condition which led to the adjudication of a child deprived has been corrected although the parent has been given not less than the time specified by [§ ]7003–5.5 of this title to correct the condition.[26]

The "uncorrected condition" to which § 7006–1.1(A)(5)(d) refers necessarily means a condition the nature of which is subject to correction by the parent's efforts, *see In re C.R.T.,* 2003 OK CIV APP 29, ¶ 16, 66 P.3d

1004, 1009, and without any change to this element in § 1–4–904(B)(5), that interpretation is unaffected. Consequently, we need not address which version governs here, because neither are applicable.

¶ 60 The Court of Civil Appeals in *C.R.T.* reversed an order terminating parental rights, finding the jury should not have been instructed under both § 7006–1.1(A)(5) and § 7006–1.1(A)(13), because the latter termination ground applies to a specific condition and controls over the more general ground. *Id.,* ¶ 18. The Court found § 7006–1.1(A)(13) "deals with a different form of 'condition,' one requiring medical, psychiatric and psychological intervention, or a combination thereof, because the condition is essentially *outside the control of the parent.*" (Emphasis added.) *Id.,* ¶ 18. Under its interpretation, the Court further found § 7006–1.1(A)(13) "contemplates a person's *inability to correct the condition*" because its language deals "with contingencies where the condition *does not respond to treatment through no fault of the person* and medical opinion concludes that *the condition will not substantially improve.*" (Emphasis added.) *Id.*

¶ 61 As in *C.R.T.,* there is no dispute in this case: (a) Mother suffers from a mental condition of the nature contemplated by § 7006–1.1(A)(13); (b) the condition to be corrected is mental illness, which was the basis for the deprived child adjudication and remained Mother's problem to the time of trial; (c) the record as a whole and the evidence at trial shows the alleged failure to correct the mental condition "follows and flows directly from the condition itself"; and (d) the deprived child case "began and was handled as a mental health problem and remained so through trial." More importantly, this record has no evidence or testimony from which a jury could find Mother failed to correct a condition which was in her ability to control.

---

**26.** Section 7003–5.5(I)(1) provided, "If reasonable efforts are required for the return of the child to the child's home, the court shall allow the parent of the child not less than three (3) months to correct conditions which led to the

adjudication of the child as a deprived child prior to terminating the parental rights of the parent." This provision is now found at 10A O.S.2011 § 1–4–707(C)(2).

¶ 62 Like the Court in *C.R.T.*, we conclude § 7006–1.1(A)(13) applied to the specific facts of this case and the trial court erred in allowing the State to also proceed to terminate Mother's parental rights under § 7006–1.1(A)(5) and to instruct the jury on that same ground. The trial court's order terminating Mother's parental rights is RE-VERSED and REMANDED for a new trial.

### Father's Appeal

¶ 63 For reversal, Father alleges three errors with trial court's pretrial rulings, *i.e.*, denying his request for court-appointed counsel, refusing to recuse, and denying severance of the parents' jury trials. The errors he claims were made during the trial include admitting prejudicial evidence, rejecting his proposed jury instructions, and failing to direct a verdict in his favor because there was insufficient evidence presented to the jury to support termination of his parental rights. Lastly, Father argues he had ineffective assistance of counsel.

### Pretrial Rulings

#### Father's Requests for Court Appointed Counsel

¶ 64 Father contends the trial court did not afford him his constitutional right to assistance of counsel by denying his three separate applications for re-appointment of court-appointed counsel and "despite knowing Father was having issues completing the ISP and receiving services" while incarcerated. He also argues the trial court's refusal to reappoint counsel "is particularly troubling in light of Father's inability to effectively read, write or communicate with others."

¶ 65 Father submitted his first "Application for Appointed Counsel and Affidavit of Inability to Employ Counsel" (Application of Counsel) dated January 10, 2008. During his incarceration, he submitted a second Application for Counsel dated May 19, 2008. A month after his release at the June 9, 2009 Review Hearing, Father submitted his third Application for Counsel. The trial court apparently denied all three of his Applications for Counsel.[27]

¶ 66 The first part of Father's argument fails to consider all three denials occurred after the deprived child adjudication in response to Applications filed one week before, during and one month after his incarceration. Despite earlier DHS findings and termination requests, that was not a possible remedy until the trial court finally ordered that "Reasonable efforts to reunite have failed" in September 2009. *See* 10 O.S. Supp.2007 § 7003–3.7(A). Two months later, the trial court *sua sponte* appointed Father and Mother counsel. As a result, he was represented a full year *prior* to the filing of State's application to terminate Father's parental rights in November 2010.

¶ 67 The record confirms the trial court denied Father's request for a treatment plan he could work while incarcerated, but he cites no authority holding such is required. Further, Father gives no record cite to support his allegations of the trial court's *knowledge* of his alleged issues with "receiving services" or communicating with DHS. Our review of the entire record reveals the trial court's first notice of Father's inability to read or write and his "limited capacity to communicate" was the ISP Progress Report filed by DHS October 8, 2010, at which time Father had been represented by counsel for

**27.** We say "apparently" because Father's 1/10/08 Application has on top of the first page a handwritten note, "D. Mike Haggerty, I already appointed" and underneath it, "Discharged 1/8/08" and "Jail 1/16/08." Similarly, the 5/19/08 Application has only a handwritten note, "Jail 5/20/08" and "Not eligible at this time, case set for review only 5/20/08," and the handwritten note at the top of the 6/09/09 Application says, "Nothing pending 7–9–09." The notes on these Applications are neither signed nor initialed, and the record reflects no minute or order denying the requests. Because State does not dispute Father's claims in his Brief in Chief that the trial court denied the Applications, we treat their admissions as curing a deficient appellate record. *House of Realty, Inc. v. City of Midwest City*, 2004 OK 97, ¶ 6, 109 P.3d 314, 317. We note for the record all three Applications are listed in the Amended Index as "Not Filed." Father did not file a designation of record, and neither Mother nor State designated the Applications for inclusion, so it is unclear why they are part of the appellate record certified by the Bryan County Court Clerk. However, we may review facts appearing of record which are *certified by the clerk* of the tribunal below. *Id.*

11 months. Moreover, there is no indication any person, other than Father, completed and signed each "Application for Appointed Counsel and Affidavit of Inability to Employ Counsel." We conclude Father has not demonstrated any constitutional or statutory infirmities in this regard. *See Matter of D.D.F.*, 1990 OK 89, 801 P.2d 703.

## Court's Refusal to Recuse

¶ 68 Father argues the trial judge was required to recuse under Rule 2.11(A)(6)(d) of the Code of Judicial Conduct,[28] claiming he could not be impartial because he had previously acted as the trial judge in two criminal cases with Father involving "a number of the same facts and witnesses" which State indicated might be called at the termination hearing. He claims the trial court's inability to "separate the cases appropriately in his own mind" is established by the trial court's entry of an order limiting the *voir dire* time of the parties at the termination trial which referred to Father as the "Defendant" three different times.

¶ 69 However, according to the order of the District Judge of the 19th Judicial District, the trial court's involvement with Father's criminal cases included accepting his waiver of preliminary hearing, his stipulation to the State's application to revoke, and sentencing Father pursuant to a negotiated plea agreement. We agree with the District Judge's opinion no reasonable person would question the trial judge's impartiality based on those actions.[29] Considering this, the timing of Father's motion to recuse, and that the jury would be the fact-finder at the termination hearing, we find Father's argument without merit.

## Trial Court's Denial of Father's motion to sever the trial

¶ 70 Father argues on appeal that he and Mother should have been granted separate trials, claiming they had opposing and inherently antagonistic defenses because he was sentenced to prison due to Mother's domestic abuse charges and the protective orders she was awarded against him. He further claims State's termination case against him went far beyond the allegations in the application to terminate his parental rights to L.M.

¶ 71 At the hearing, the trial court clarified with Father's counsel the basis of the severance motion as "the factual basis for criminal charges against your client … is, also, alleged as a basis for State's motion to terminate Father's parental rights." Thereafter, Father's counsel repeated his position that Mother may decide to assist the District Attorney and "double up" against his client. The trial court concluded the latter could occur whether the trials were separate or together, and because the jury would receive instructions and verdict forms, separate as to each parent and as to each ground alleged, he denied Father's motion, finding nothing prejudicial about a single trial for the parents.

¶ 72 According to the cases Father cites as authority, a defendant is "double teamed" or placed in a "two against one" situation to his detriment when *court appointed counsel for a child victim* actively participates in the trial beyond limits provided by statute,[30] *i.e.*, taking an adversarial role against the defendant. *Cooper v. State*, 1996 OK CR 38, 922 P.2d 1217; *In re J.D.D.*, 2010 OK CIV APP 102, 241 P.3d 691. "Mutually antagonistic defenses occur when each defendant attempts to exculpate himself and

---

28. Rule 2.11(A)(6)(d) provides a trial judge should disqualify if he or she "previously presided as a judge over the matter in another court or in any adjudicatory capacity."

29. The District Judge opined "even assuming the facts of either of [Father's] cases are partly the basis for the termination proceeding in the instant case … no reasonable person can suggest that [Judge Powers'] impartiality might reasonably be questioned based on his acceptance of a stipulation to the State's application to revoke

suspended sentence and based on his imposition of a sentence pursuant to a negotiated plea agreement."

30. The language limiting the participation of court appointed counsel for a child victim in a criminal case, 21 O.S. Supp.1992 § 846(G)(1), was discussed in *Cooper.* As noted by the Court in *J.D.D.*, the identical statutory language was later adopted under the OCC as 10 O.S. Supp. 1998 § 7003–3.7 and is now found at 10A O.S. 2011 § 1–4–306(A)(2)(c).

inculpate the co-defendant." *Spunaugle v. State*, 1997 OK CR 47, ¶ 23, 946 P.2d 246, 251(overruled on other grounds). Defenses are antagonistic when "to believe one is to disbelieve the other." *Id.* "Severance is also required when the State introduces the confession of a non-testifying co-defendant which inculpates another co-defendant." *Id.*, ¶ 25. The decision to sever a trial between co-defendants or a trial between parties in a civil action is left to the sound discretion of the trial court. *Id; Herbert v. Wagg*, 1910 OK 334, ¶ 4, 117 P. 209, 212.

¶ 73 Father's arguments fails for two reasons. First, his "double teaming" argument in favor of severance addresses Mother's court appointed attorney in this proceeding, not L.M.'s attorney. Second, Father's alleged failure to correct the condition which led to L.M.'s adjudication is the sole ground for termination of his parental rights. Father has failed to demonstrate not only the potential for a "two against one" situation but also how Mother's potential testimony at a termination trial, joint or severed, about the domestic violence criminal charges she filed against him could inculpate Father on that termination ground, the successful completion for which he is solely responsible. Equally important, Father has failed to show any prejudice or injustice resulting from the joinder of the parents' trial. *See* 12 O.S. Supp.2004 § 2020(D); *All American Bus Lines v. Saxon*, 1946 OK 199, ¶ 23, 172 P.2d 424, 428; *Spunaugle*, ¶ 22. We find no abuse of discretion with the denial of Father's motion to sever.

### Rulings During Trial

#### *Preliminary Issue*

¶ 74 State moved for termination of Father's parental rights to L.M. based solely on his failure to correct the conditions which led to L.M.'s deprived status adjudication,

relying on 10A O.S. Supp.2009 § 1-4-904(B)(5). However, the trial court's jury instruction listed the elements of its predecessor, 10 O.S.2001 § 7006-1.1(A)(5). To avoid repetition, we find applicable here our analysis under Mother's appeal concerning fundamental error and retroactive application of amended statutory grounds in deprived child proceedings. Based on our review of § 1-4-904(B)(5) we conclude it also affects the parties' substantive rights.

¶ 75 Prior to May 21, 2009, § 7006-1.1(A)(5) required "[a] finding that: (a) the child has been adjudicated to be deprived, (b) such condition is caused by or contributed to by acts or omissions of the parent, (c) termination of parental rights is in the best interests of the child, and (d) the parent has failed to show that the condition which led to the adjudication of a child deprived has been corrected although the parent has been given not less than three months." [31] This clear and unambiguous ground for termination has been interpreted by Oklahoma courts for decades.

¶ 76 On and after May 21, 2009, § 1-4-904(B)(5) requires "[a] finding that: (a) the parent has failed to correct the condition which led to the deprived adjudication of the child, and (b) the parent has been given at least three (3) months to correct the condition." [32] Absent from § 1-4-904(B)(5) is the element, "such condition is *caused by or contributed to* by acts or omissions of the parent," which was added by the Legislature in 1977 and authorized termination of parental rights *only if* a parent has failed to correct the particular condition(s) for which that parent's acts or omissions was either the sole cause or a contributing cause. (Emphasis added.) *In re L.G.*, 1993 OK CIV APP 162, ¶ 7, 864 P.2d 1301, 1303.

¶ 77 Deleting this element removed a statutory protection afforded to Father which existed when the deprived child proceeding

---

31. Because Father chose not to present any of his own evidence or testimony after State rested, we need not decide here whether the Legislature's 2009 amendment to § 1-4-904(B)(5), now requiring a finding "the parent has *failed to correct* the condition" changes the long-standing shifting of the burden of evidence or persuasion that originated with pre-1975 versions of 10 O.S. § 1130(c). Section 1130(c), which applied to "a

parent who is entitled to custody" ... [and] "has *failed to show* that the condition ... has been corrected," was unchanged until the Legislature's amendment to § 7006-1.1(A)(5). (Emphasis added.)

32. See *fn 9* for the two § 1-4-904(A) elements.

was initiated against him. Had amended § 1–4–904(B)(5) been applied, State's evidentiary burden would have been decreased and Father's defense in opposing termination would have been increased, thereby affecting the parties' substantive rights. As a result, § 7006–1.1(A)(5)'s application is protected by Art. 5, § 54, the jury was so instructed, and we conclude the trial court correctly applied this version of the termination ground to the facts of this case.

*Sufficiency of the Evidence Supporting Termination Under 10 O.S.2001 § 7006–1.1(A)(5)*

¶ 78 Father cites to three Oklahoma cases for the proposition that without proof of actual or imminent harm to the child, there is no justification for permanent severance of the parent's rights based on: (1) a parent's inability to have physical custody of a child, *Matter of Baby Girl Williams,* 1979 OK 150, ¶ 10, 602 P.2d 1036; (2) poor, uneducated parents with a dirty house and dirty children, *Matter of Sherol A.S.,* 1978 OK 103, 581 P.2d 884, and (3) incarceration of a parent, *Matter of A.K.,* 2008 OK CIV APP 104, 198 P.3d 415.

¶ 79 According to Father, there was "insufficient evidence" to justify termination of his parental rights, because there was no testimony or evidence of any harm to L.M. at the time he was removed from Mother's custody. He contends State's evidence only established Mother's house was dirty and there was no obvious food, while the only other witness who saw the child testified the child appeared dirty but not malnourished.

¶ 80 The record confirms Father's argument the scant testimony about L.M.'s lethargy and medical issues did not arise until several months after the child had been removed from the parent's care. However, this does not mean there was no evidence of harm or threatened harm, especially considering the undisputed evidence that L.M. was developmentally behind for his age.

¶ 81 Father also contends State's witnesses all confirmed Father was an inmate in the Johnston County Jail when L.M. was removed from Mother's home and there is no testimony Father knew about the conditions of her home or failed to act on the conditions leading to the deprived finding. Taken as a whole, Father's argument questions whether State carried its burden to prove by clear and convincing evidence that Father's acts or omissions caused or contributed to the conditions leading to L.M.'s adjudication.

¶ 82 Our research yields only one Oklahoma case applying this element to similar facts. The Court in *In re L.G.,* 1993 OK CIV APP 162, 864 P.2d 1301, held termination of Mr. Garrion's parental rights was not justified under the circumstances or authorized by 10 O.S.1991 § 1130 (§ 7006–1.1(A)(5)'s predecessor). The Court observed it was undisputed that the child had been removed from the home and custody of the mother due to her neglect and abuse and that Mr. Garrion did not reside there. As pertinent here, the Court found "[t]he *only* detrimental condition caused by or contributed to by Mr. Garrion that formed the basis of the 'deprived adjudication' was domestic violence against the natural mother in the presence of the child." (Emphasis in original.) *Id.,* ¶ 7. Because it was undisputed no further violence between the parents had occurred in the child's presence after the State's intervention, the Court concluded "[*T*]*he correction of this sole detrimental condition was achieved.* By the express provisions of 10 O.S.1991 § 1130(A)(3), termination was authorized only in the event Mr. Garrion failed to correct *this particular condition and contributing cause* of W.G.'s deprived status." (Emphasis added.)

¶ 83 It is undisputed in this record that prior to the first DHS referral, Mother had obtained the 2007 Protective Order against Father and that he was incarcerated for unknown reasons when L.M. was removed from Mother's home. State presented no evidence Father had been living in Mother's home or had visited there any time prior to the adjudication, or that he knew about Mother's past or current mental health issues and the effect of the numerous prescriptions she was taking for physical and mental conditions. Similar to *L.G.,* Father here was not residing with Mother and L.M. at the time he was removed from the home *due to* Father's domestic violence against Mother. "Domestic violence"

was clearly identified as one of the conditions to be corrected on the treatment plan he signed in October 2007. Unlike in *L.G.* where the correction of the condition had been achieved, there was another incident of domestic violence in November 2007 between Father and Mother at counseling they were both attending, which was a partial cause for his subsequent three-year incarceration. The jury also heard several caseworkers and Father's counselor testify he had not corrected his anger and domestic abuse issues since his release from jail.

¶ 84 This same evidence defeats Father's remaining argument that the testimony established, even though he did not complete the plan, he made sincere and exhaustive efforts to do so, relying on *Matter of J.L.*, 1978 OK 37, 578 P.2d 349. The Supreme Court in *J.L.* reversed the termination order where the evidence "as a whole" showed "sincere and extensive efforts to change the conditions leading to the child's adjudication." *Id.* at ¶ 16. The evidence in this case clearly does not make the same showing.

■ ¶ 85 There is clear and convincing evidence to support the judgment that Father failed to correct the conditions which led to the deprived adjudication. However, the judgment fails to make the required finding under § 7006–1.1(A)(5) that "termination of parental rights is in the best interests of the child." Because the jury was clearly instructed on that element, we presume the jury properly followed the instructions as a whole and its verdict terminating Father's parental rights necessarily embodied that finding. *Matter of T.R.W.*, 1985 OK 99, 722 P.2d 1197, 1203. However, given this "fundamental deficiency," the judgment must be remanded to the trial court, not for a new trial, but with instructions to enter a proper final order correcting the error. *Matter of Children M.B.*, 2010 OK CIV APP 41, ¶ 11,

232 P.3d 927, 931 and *Matter of E.G.*, 2010 OK CIV APP 34, ¶ 11, 231 P.3d 785, 789.

### *Evidentiary and Other Rulings*

¶ 86 Father alleges the trial court erred by admitting State's Exhibit No. 7, a copy of the 2007 Protective Order against him and "allowing discussion of the permanent protective order entered in Case No. PO–2010–106" (2010 Protective Order).[33] We find no error with either of the rulings.

■ ¶ 87 Error may not be predicated upon a ruling which admits evidence unless a substantial right of a party is affected and a *timely objection* appears of record, stating the *specific* ground of objection if such ground was not apparent from the context. 12 O.S.2011 § 2104(A)(1). When the trial court asked if there were any objections to admissions of State's Exhibits No. 6 or 7, Father responded, "[n]o objection to 6. On 7, subject to our previous arguments."

¶ 88 The trial transcript reveals the "previous arguments" involved the 2010 Protective Order, which is not part of Exhibit No. 7. Only the 2007 Protective Order is marked "Exhibit No. 7," to which there was no specific objection. Without such, Father has failed to preserve for our review any error with the admission of State's Exhibit No. 7.[34] *Matter of A.W. and M.W.*, 2011 OK CIV APP 27, 250 P.3d 343.

¶ 89 The "previous arguments" occurred on the second day of trial, beginning with Father's objection to State's proposed admission of "a certified copy of the 2010 Protective Order," which Father explained to the trial court had been granted by another trial judge under the Protection From Domestic Abuse Act, 22 O.S. § 60 et seq. After arguing that judge lacked jurisdiction over the child due to the pending termination action and the protective order lacked an expiration date as required by statute, Father stated his

33. Father also refers to the 2010 Protective Order as the "permanent protective order."

34. Even if Father's specific objections regarding the 2010 Protective Order could somehow be construed to also apply to the 2007 Protective Order, this court would find no error with its admission. The jury heard considerable testimony about the 2007 Protective Order the first day

of trial, without objection by Father, and some of the testimony was elicited by Father's counsel during cross-examination. A party may not complain about admission of evidence over his objection, where other evidence of the same tenor was admitted without objection. *In re F.B.*, 1999 OK CIV APP 96, 990 P.2d 309.

objection "would go to the enforceability of the order."

¶ 90 A lengthy discussion of his objections followed, revealing Father had filed a "motion to recall or dismiss" the 2010 Protective Order "as to the child" which motion was still pending with the other judge. The trial court agreed with State that the protective order was "still in effect" and refused "to rule on whether [that protective order] was void or not," explaining Father could either accept State's proffered stipulation or the 2010 Protective Order would be admitted. *In lieu of the admission of the certified copy,* Father stipulated to State's announcement the 2010 Protective Order "was filed by [Mother] on behalf of herself and [L.M.] on July 12, 2010," and "on July 30, 2010 a final order of protection [was] entered and remains in place at this point in time." After presenting additional witnesses, State moved to admit "Exhibit No. 7" *and* announced the parties' stipulation regarding the 2010 Protective Order. Father responded as described above, Mother's counsel approved, and the trial court admitted the exhibit *and* also accepted the parties' stipulation.

█ ¶ 91 On appeal, Father does not contend State's "discussion" of the 2010 Protective Order went beyond the parties' stipulation. Instead, he argues (1) the same objections regarding "enforceability" he raised below and (2) the "discussion" about the 2010 Protective Order was *not relevant* to State's application to terminate his rights and its "usefulness ... clearly did not outweigh the prejudicial impact on [his] case."

¶ 92 The trial transcript discloses Father did not object to that order based on irrelevancy or, even if relevant, that its probative value would be outweighed by the danger of unfair prejudice. Consequently, he failed to preserve this argument concerning the 2010 Protective Order. *Interest of A.W. and M.W., id.*

█ ¶ 93 Father did, however, preserve his "enforceability" argument which the trial court declined to decide. He argues the 2010 Protective Order should not have been admitted because (1) the trial judge lacked jurisdiction since the juvenile court already had custody of the child and (2) the order is contrary to several statutes.

¶ 94 The statutes he relied upon at trial are part of the Protection from Domestic Abuse Act (the Act), specifically 22 O.S. Supp.2009 § 60.4(I)(1) and § 60.4(G)(1).[35] Section 60.4(I)(1) of the Act unambiguously precludes a protective order issued under the Act from affecting "title to real property or purport to grant the parties a divorce or otherwise purport to determine" numerous issues, including visitation and child custody or "any other like relief obtainable under Title 43." Title 43 has no application to the proceedings brought under the OCC.

¶ 95 Father also argues the 2010 Protective Order was filed "without an expiration date" contrary to § 60.4(G). This section mandates that a protective order issued under the Act "shall be for a fixed period not to exceed a period of three (3) years unless extended, modified, vacated or rescinded upon motion by either party." Nothing in the record establishes this deficiency, since Father agreed to the specific oral stipulation, which provides only the date the protective order was issued. He did not make an offer of proof regarding the expiration date, and absent a record showing otherwise, this court presumes the trial court did not err. *Hamid v. Sew Original,* 1982 OK 46, 645 P.2d 496.

¶ 96 Concerning the trial court's refusal to decide if the protective order was void, § 60.4(G)(3) of the Act provides "[u]pon the filing of a motion by either party to modify, extend, or vacate a protective order, a hearing shall be scheduled and notice given to the parties. At the hearing, the *issuing court* may take such action as is necessary under the circumstances." (Emphasis added.) Clearly, *only* the judge who issued the 2010 Protective Order had authority to decide its validity. We find no error with the trial court's acceptance of the parties' stipulation

**35.** The other statutes Father raises for the first time do not support his argument. Title 10A O.S.2011 § 1–4–706(A)(3) simply allows a juvenile court during the pendency of a deprived action to modify any order regarding child support, visitation or legal custody in any other administrative or district court proceeding.

that the 2010 Protective Order "remains in place."

### Jury Instructions

¶ 97 It is the trial court's duty to instruct upon the decisive issues of the case as supported by the pleadings and evidence introduced. *Matter of S.C.*, 1992 OK CIV APP 40, ¶ 5, 830 P.2d 200, 202. The tests on review of instructions given or refused are whether there is a probability that the jurors were misled and reached a different conclusion than they would have reached but for the questioned instruction, or whether there was excluded from consideration a proper issue of the case. *Id.*

¶ 98 Father alleges the trial court erred by rejecting three of his proposed jury instructions, the first two of which are addressed together. Father's proposed instruction No. 16 would have informed the jury that parents should not be held to the same standard of proof as that carried by State. His proposed instruction No. 17 would have informed the jury they were not required to terminate his parental rights if they found he had made sincere and extensive efforts and had shown substantial changes concerning the conditions creating L.M.'s deprived status.

¶ 99 Father's argument fails to consider after State rested and the trial court denied the parents' demurrers, he also rested. By doing so, he voluntarily chose to allow the jury to hear only State's evidence, thereby taking a risk as to whether the jury believed State met its burden of proof by clear and convincing evidence. Had Father testified or presented witnesses and/or evidence about his alleged sincere efforts and substantial changes toward correcting the condition, we would agree both proposed instructions should have been given. However, having previously concluded State proved by clear and convincing evidence that he failed to correct the condition, we find no error with the rejection of Father's proposed instructions. *See Matter of M.A.*, 1992 OK CIV APP 61, ¶ 24, 832 P.2d 437.

¶ 100 Father's proposed instruction No. 4 would have informed the jury they should not terminate the parental rights of a parent unless there were specific standards clearly prescribed for the parent and the parent was given a reasonable opportunity to comply with the prescribed standards. This argument fails to consider the jury was given State's Exhibit No. 2, a copy of the treatment plan detailing the conditions to be corrected and his requirements DHS believed would help him to correct the conditions, which he signed in October 2007. One of the case-workers testified treatment plans are written at a first grade level while another testified he had explained it to him again when he was released from prison in May 2009. We find no error with the trial court's refusal to give Father's proposed instruction No. 4.

### Ineffective Assistance of Counsel

¶ 101 To prove ineffective assistance of counsel in termination proceedings, a parent must show the attorney's performance was deficient and prejudiced the parent's defense. *Matter of S.S.*, 2004 OK CIV APP 33, ¶ 11, 90 P.3d 571, 575. "The reviewing court must look at the proceedings as a whole, and 'there is a strong presumption that counsel's performance falls within the wide range of professional assistance.'" *Id.* (quoting *In re R.S.*, 2002 OK CIV APP 90, ¶ 16, 56 P.3d 381, 384).

¶ 102 Father's first argument is premised on his court-appointed counsel's failure *to file a discovery request,* resulting in State's "surprise" introduction of the 2007 Protective Order *and* the discussion of the 2010 Protective Order. He claims such failure prevented an opportunity (1) to pursue a motion *in limine* or other motion to block "the original, wrongfully-entered order" from being presented or discussed at the jury trial, and/or (2) to have the "wrongfully-entered order" vacated.

¶ 103 We first note Father's "wrongfully-entered order" argument, both below and on appeal, was limited to the 2010 Protective Order, about which the record establishes only that his counsel's motion to vacate had been pending with the issuing judge for some unknown time *before* the termination hearing. Thus, at least to the 2010 Protective Order, the record does not establish any surprise of its existence. However, even if

Father's counsel had made a discovery request, learned State intended to admit it, and thereafter filed a pre-trial *in limine* or other motion to block its admission, there is no guarantee the trial court would have sustained the motion, considering its potential relevancy to Father's failure to correct the condition of domestic violence against Mother. Moreover, even if the trial court had denied the pre-trial motion, such ruling is preliminary only. Father has not demonstrated his trial attorney's alleged failure to discover prejudiced his defense.

¶ 104 Father's second argument is premised on his court-appointed counsel's failure to object at the trial to the admission of the 2007 Protective Order for lack of relevance. "A trial court has discretion in deciding whether proffered evidence is relevant and, if so, whether it should be admitted." *Myers v. Missouri Pacific R. Co.*, 2002 OK 60, ¶ 36, 52 P.3d 1014, 1033. We assume the trial court's acceptance of the parties' stipulation implies it had decided even the limited discussion of the 2010 Protective Order was relevant to the issue on continued domestic abuse. Therefore, it seems evident the 2007 Protective Order would have been admitted *even if* Father's trial counsel had made a timely relevancy objection. "While it may have been better practice for [Father's] trial counsel to have raised the objection in controversy, we do not find that failure affected the outcome of the proceedings." *In re R.S.*, 2002 OK CIV APP 90, ¶ 20, 56 P.3d 381, 384. The finding in *R.S.* clearly applies here.

## CONCLUSION

¶ 105 The order terminating Mother's parental rights is REVERSED AND REMANDED FOR A NEW TRIAL. This opinion does not affect DHS foster care placement, which is its sole purview and responsibility. As to Father, the order of termination is AFFIRMED, but REMANDED to correct a deficiency in the termination order.

BELL, P.J., and MITCHELL, J., concur.